## COMMONWEALTH *vs.* MICHAEL J. SIMPSON.

No. 96-P-1000.

Middlesex. September 17, 1997. - January 20, 1998.

Present: KASS, FLANNERY, & SPINA, JJ.

Further appellate review granted, 427 Mass. 1103 (1998).

*Practice, Criminal,* Defendant pro se, Competency to stand trial, Assistance of counsel. *Constitutional Law,* Assistance of counsel. *Mental Impairment.*

In the circumstances of a criminal case, where the judge reasonably had determined that the defendant was competent to represent himself, but the defendant's opening statement raised "a substantial question of possible doubt" of the defendant's competence, the judge should have reopened the competence issue at that time on his own motion. [160-163] SPINA, J., dissenting.

Where the record of a criminal trial raised grave questions whether the defendant was competent to stand trial or competent to waive the assistance of counsel and to present his own defense, the defendant was entitled to a new trial and a hearing on the issue of his competence. [163] SPINA, J., dissenting.

Discussion of the issues of a criminal defendant's competence to stand trial [163-165] and competence to waive assistance of counsel [165].

INDICTMENTS found and returned in the Superior Court Department on March 17, 1993.

The cases were tried before *Peter M. Lauriat,* J.

A motion for appointment of a guardian ad litem was heard in the Appeals Court by *Perretta,* J., and a motion to reconsider was also heard by her.

*Richard J. Shea* for the defendant.

*Geraldine C. Griffin,* Assistant District Attorney, for the Commonwealth.

KASS, J. Insistent upon his sanity, the defendant, Simpson, conducted his own defense, aided by "stand-by" counsel. A jury found him guilty, among other things, of mayhem and of

assault with a dangerous weapon with intent to murder.[1] Simpson's appeal, as briefed, is susceptible of summary disposition in the Commonwealth's favor (see the Appendix to this opinion), but the record raises grave questions whether Simpson was mentally competent to stand trial and competent to assist in (let alone manage) his defense. We decide, particularly on the basis of what Simpson said in his opening statement, his cross-examination of the Commonwealth's principal witnesses, and his closing argument, that his competence to stand trial or conduct his defense was greatly in question and that, in the circumstances, the trial judge, on his own motion, should have conducted a competence hearing at which he would have received evidence from mental health professionals such as psychiatrists or psychologists.

That Simpson committed a savage assault is not in question. While the victim slept, Simpson struck her in the head with a hammer. Fortunately awakened rather than rendered unconscious, the victim jumped from her bed and saw Simpson with the hammer up, ready to strike again. Simpson switched weapons to a buck knife he was in the habit of carrying. With that he stabbed the victim several times in the neck and finished his work by slashing her left cheek from her ear almost to her mouth. At his trial, Simpson said that he had acted in self-defense.

The victim and Simpson were well known to one another. Indeed, they had lived together for some months in the victim's home. The victim had come to the conclusion that Simpson could not get a grip on a complex of personal problems and had ordered him out. On the day he was supposed to leave, Simpson spoke morosely of his "last supper." The attack occurred later that night.

Simpson's first counsel raised the question of his mental competence at a pretrial conference on May 25, 1993. In response to counsel's request, the Superior Court judge who presided at the pretrial conference, acting under G. L. c. 123, § 15(*a*), ordered that Simpson undergo an evaluation as to whether he was competent to stand trial. The psychiatrist who examined Simpson reported her opinion that Simpson "may

---

[1]There were five indictments on which the jury returned verdicts of guilty: (1) assault with a hammer with intent to murder; (2) assault with a knife with intent to murder; (3) assault and battery with a hammer; (4) assault and battery with a knife; and (5) mayhem.

well be suffering from a paranoid delusional disorder." It was also her opinion that Simpson was "not presently competent to stand trial or to represent himself in court." She recommended further evaluation under G. L. c. 123, § 15(*b*), at Bridgewater State Hospital (Bridgewater), and the judge so ordered. Simpson declined to cooperate with the two forensic psychologists at Bridgewater who attempted to evaluate him, and they reported themselves as unable to offer a clinical opinion about his mental status.

Simpson came before a second Superior Court judge on October 4, 1993. While at Bridgewater, Simpson had fired his lawyer because that lawyer had urged the mental status examinations, notwithstanding Simpson's consistent declarations that he was sound as a bell. New counsel attended the October 4 proceedings but took no position at the time on behalf of Simpson on the competence issue. The second Superior Court judge smelled trouble and recommended that another psychiatrist — one who had on varying occasions been employed by the Commonwealth and by defendants — examine Simpson and make a mental competence evaluation.

No such examination took place. On December 7, 1993, the case came before a third Superior Court judge. Neither new defense counsel nor the prosecutor informed the judge about Simpson's mental status history or what the preceding judges had ordered. Indeed, in what was not his finest hour, defense counsel told the judge, "I don't think there is any question about competency and I can state for the record, I believe Mr. Simpson, insofar as competency to understand in the trial process, is fine." Simpson told the judge that he had been "railroaded to Bridgewater for evaluation to represent [him]self." The upshot of the December 7 proceeding was that the case was continued.

When the case came on for trial on May 31, 1994, before a fourth Superior Court judge, once again neither prosecutor nor defense counsel mentioned the mental status evaluation history. Neither told the judge that the defendant's competence to stand trial and to engage in his defense was, or had been, in question, although Simpson himself adverted to "being sent to Bridgewater for evaluation — under what grounds I don't know." Simpson declared that he desired to present his defense pro se, although he would have the assistance of Attorney Daniel Solomon as stand-by counsel. Mr. Solomon was to sit at counsel table

and come to sidebar and lobby conferences. After explaining to Simpson that he would have to call and examine his own witnesses, would have to conduct cross-examinations, and would be the only one to have a speaking role before the jury, the judge further probed into whether Simpson understood what he was taking on in acting pro se. Simpson was alert and outwardly rational in his responses. Asked about whether he had ever suffered from mental illness, Simpson answered "no" and as to his current state said, "I have no such illness, your Honor." He denied taking any medication (except Tylenol for occasional headaches) and denied current consumption of drugs or alcohol. As to the charges against him, Simpson demonstrated understanding and, indeed, when asked by the judge if he understood that the indictment of mayhem carried a maximum ten-year penalty, Simpson responded, correctly, "I believe it's twenty years, your Honor." As the judge explained the trial process, Simpson again manifested that he was well-read, well-briefed, or both. For example, the judge asked:

> "And do you understand that in this case, fourteen jurors will be selected from among the jury group or panel of proposed jurors, and the fourteen jurors will be the jury for the trial of your case?"

Simpson answered:

> "Yes, your Honor, I believe that will be twelve jurors and two alternates."

On the basis of Simpson's apparently rational and informed responses, the judge — understandably — found that Simpson was "not presently suffering from any mental illness or condition." The judge also found that Simpson understood the charges against him, grasped the nature of what goes on in a trial, and that he "knowingly, willingly, and voluntarily has decided to proceed pro se, representing himself in this case, with the assistance of stand-by counsel."

A determination of competence to appear pro se is, however, distinct from the determination of competence to stand trial. See *Westbrook* v. *Arizona*, 384 U.S. 150 (1966); *Godinez* v. *Moran*, 509 U.S. 389, 400-401 (1993); *Commonwealth* v. *Barnes*, 399 Mass. 385, 388, 389 (1987); *Commonwealth* v. *Wertheimer*, 19 Mass. App. Ct. 930, 930-931 (1984). The trial judge made no

express finding that Simpson had a rational and factual understanding of the proceedings, but that is not at all to be wondered at because the issue had not come up and the defendant, up to that point, had been acting rationally.

When the defendant made his opening statement, however, the trial judge must have begun to harbor some doubt about how rationally Simpson saw the world and his situation. Simpson addressed the jurors as follows:

> "Now ladies and gentlemen, you've heard some very serious allegations here. And myself being the defendant and representing myself, I dispute these allegations vehemently. What you heard from the district attorney is some very exaggerated charges. The defense, the defendant, that's me, hereby invokes self-defense, abuse defense. This woman, the alleged victim, the Commonwealth's witness — the Commonwealth is prosecuting this case. The charges have not been pressed by my ex-girlfriend, the charges have been pressed by the Commonwealth. That is a crime against the State.

> "This crime against the State is being supported by the Commonwealth's witness, my ex-girlfriend, who is a traitor, who is a Fem-Nazi, who doesn't even like men that much. She's a schizophrenic alcoholic and she should have her head examined. But she's a good enough witness to railroad my person. My person has been the victim of harassment and threats from the Waltham police, local landlords. I've been involved in tenants' organizations. I've been railroaded, jailed, beaten, deprived of my rights, claimed that I wasn't a resident while I was a registered voter. I've been fired for endless continuances on stupid little trespassing charges which wasn't even a legal criminal charge. And my ex-girlfriend got involved in this after our relationship started to crumble. And this woman turned and traitored on me and plotted with others my murder. And it turns out that it's evidently, there is evidently a scam that might have taken place during the time of my residence in Germany. I lived fifteen years in Germany, I served in the Air Force as a clerk in Germany. And I went back over there, I had a girl there and I went to school there, I lived and worked there.

> "And it's come to my attention, it's been indicated to me

by many means, open and veiled, that someone has been kiting some scams, a certain Mafia prostitute, cocaine-dependent Mafia prostitute, whose name has been on occasion mentioned to me. She has been kiting scams in my name. And that is the reason why the people have been harassing me, certain individuals, certain individuals of the Commonwealth, certain individuals on the Waltham police force . . . .

"My person has been threatened and it seems to be by the persons who were doing the threatening that there are three things they're after. It's either my signature they're gonna extort from me, or they're gonna railroad me to Bridgewater State Mental Hospital, so that I won't be what's called 'contractual capacity.' So at that point, anyone who's been kiting some scams or something in my name, allegedly there's a mortgage out there in my name, or benefits have been applied for in my name without my knowledge or consent that I have never had anything to do with this. That once testimony, what they call 'testimonial or contractual capacity' is taken from one to a commitment in a mental institution, then that would present no problem for the persons allegedly kiting these schemes in my name.

"And [the victim] had indicated to me herself, in voice and veiled threats against my person and my physical well-being, against even my life on several occasions. And I had questioned her about this, if there were any surveillance equipment installed in her apartment. I was being harassed from people, with voices that weren't physically present. It's like the wind, you can hear the wind but you can't see it . . . .

"These are very real things, ladies and gentlemen, these are very real things, extremely hard to prove, because the people perfecting these scams are the conspirators installing these equipment. Of course, they're not gonna be caught, of course they're gonna try to drive me crazy . . . . Many sources have indicated that they're after me, that my person is being victimized and harassed because of my political beliefs and because of my political action. And to that fact that allegedly has been indicated to me on

several occasions, veiled and openly, even sometimes from police officers with a billy-club in his hand — 'He's not married yet.'

"And I contend to you, ladies and gentlemen of the jury, that I will prove, intend to prove, by the evidence given here in this court, by testimony, that this is a conspiracy, and that I as the defendant am not criminally liable for any actions resulting therefrom. And I hereby invoke self-defense, self — the right of self-defense and an abuse of defense, as my life was in imminent danger at the time . . . . I consider these five indictments, I consider them more of a joke than anything else, because with the right of self-defense, I think that my actions are more to be interpreted as an act of war, an act of self-defense, an act of war which is not a crime, than criminal actions."

Similar preoccupation by Simpson with Hydra-headed conspiracies against him dominated his cross-examination of prosecution witnesses and his closing argument. He offered no direct evidence, other than to recall the victim for further cross-examination.

1. *Competence to stand trial or conduct his own defense.* We think that upon hearing the defendant's opening statement, the judge should have blown the whistle and conducted a hearing as to the defendant's competence to stand trial, i.e., whether the defendant had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky* v. *United States*, 362 U.S. 402, 402 (1960). *Commonwealth* v. *Hill*, 375 Mass. 50, 54 (1978). The rationality of the defendant in relation to the proceedings against him is the core of competence determination. *Godinez* v. *Moran*, 509 U.S. at 397.

We do not minimize the difficulty of the situation that confronted the trial judge. There had been no claim of impaired mental status by Simpson, and, at a certain level, Simpson had understood with precision the offenses with which he had been charged and the punishments that the court might impose. He had a grasp of how a trial proceeds, i.e., opening statements, direct examination, cross-examination, and closing arguments. He knew that he could decide whether to testify in his own behalf (he ultimately decided that he would not). He was able

to adhere to courtroom decorum. In these respects he seemed quite rational.[2]

On the other hand, Simpson's underlying defense position, that he was entitled to hammer a sleeping woman in the head, as well as knife her, because of a pervasive conspiracy arrayed against him by multiple forces, some only heard and unseen, was dramatically irrational. There infiltrates into the question of competence to stand trial the question of criminal responsibility.[3] A person is not fit to manage the machinery of a trial, either to stand trial or to conduct a defense, if the world that person inhabits is distorted by irrationality. Simpson's opening was indicative that he was divorced from reality. Determination of how significant that breach was and how it bore on his competence to formulate a rational defense and to assist in the presentation of that defense would have been greatly aided by the assistance of trained specialists.[4] A further question for those specialists would be whether Simpson's apparent delusional state was contrived.

Mental responsibility, a shorthand phrase we use for the question whether the defendant is or is not responsible for a crime by reason of mental illness, and competence to stand trial (and conduct a defense) are determinations both separate and related. The arsonist with an irresistable impulse to set and watch fires may lack criminal responsibility but be quite competent to stand trial — at which he may introduce an insanity defense. *Lyles* v. *United States*, 254 F.2d 725, 729 (D.C. Cir. 1957), cert. denied, 356 U.S. 961 (1958). The murderer who persists in believing at

---

[2]For an elaboration of the factors a court may consider in determining fitness to stand trial, see *State* v. *Guatney*, 207 Neb. 501, 545 (1980).

[3]It is deeply rooted in the law that a person whose mental condition deprives him of moral understanding lacks the capacity to commit a crime. See Melton, Petrila, Poythress, & Slobogin, Psychological Evaluations for the Courts § 8.02(b) (2d ed. 1997); Note, Incompetency to Stand Trial, 81 Harv. L. Rev. 454, 458 (1967). Massachusetts, following the guidance of the Model Penal Code § 4.01 (1985), measures criminal responsibility as follows: "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967).

[4]Although mental health specialists can obviously be helpful, a determination of a defendant's mental responsibility, i.e., sane or insane, may be made by the trier of fact without the assistance of expert testimony. *Commonwealth* v. *Monico*, 396 Mass. 793, 798 (1986).

trial that he was and continues to be justified in killing electricians because they wire him so that he hears intolerable voices and can get no rest is unlikely to be able to assist in the presentation of a rational defense, let alone conduct his own defense. See *State* v. *Kahn*, 175 N.J. Super. 72, 78-79 (1980).

If the defendant has not raised the issue of competence to stand trial, the trial judge has an obligation to raise the issue on the judge's own motion if developments in the trial raise "a substantial question of possible doubt" about the defendant's competence. *Rhay* v. *White*, 385 F.2d 883, 886 (9th Cir. 1967). *Commonwealth* v. *Vailes*, 360 Mass. 522, 524 (1971). *Commonwealth* v. *Hill*, 375 Mass. at 54. *Commonwealth* v. *Crowley*, 393 Mass. 393, 398-399 (1984). At the outset of Simpson's trial, the judge, on the basis of what he had observed of the defendant in their colloquy, reasonably concluded that Simpson was competent to stand trial and to represent himself. The judge's duty, however, to probe into the competence issue on his own initiative survives the first determination. If events during the trial raise "a substantial question of possible doubt," the judge must revisit the issue of competence, even at the cost of interrupting the trial with a hearing into the question. *Drope* v. *Missouri*, 420 U.S. 162, 181-182 (1975). *Commonwealth* v. *Martin*, 35 Mass. App. Ct. 96, 99 (1993). It is not an adequate response to say, as does the dissent, that the issue was lost because no party raised it at trial. The trial judge is "the directing and controlling mind at the trial, and not a mere functionary to preserve order and lend ceremonial dignity to the proceedings." *Whitney* v. *Wellesley & Boston St. Ry.*, 197 Mass. 495, 502 (1908). *Commonwealth* v. *Lewis*, 346 Mass. 373, 379 (1963), cert. denied, 376 U.S. 933 (1964). Indeed, the failure to raise the question may illustrate the defendant's problem, not answer it, and we must confront that problem.

Simpson's manifestations of paranoid delusion raised a "substantial question of a possible doubt" about whether he was competent to stand trial and, more urgently, about whether he could conduct his own defense. Indeed, although it had not been drawn to the trial judge's attention, the mental status report of Dr. Baxter, the court psychiatrist who first examined Simpson, had already raised substantial questions about Simpson's competence to stand trial, and those questions had not been resolved. No contrary evaluation of Simpson as competent

had ever been produced. In that respect, the case resembles *Commonwealth* v. *Rise*, 7 Mass. App. Ct. 106, 107-108 (1979), in which a court psychiatrist's determination of incompetence was never resolved by later examination and we ordered a new trial. Here, too, it was error not to have conducted a further competence hearing in light of Simpson's bizarre performance.

2. *Remedy for failure to hold a competence hearing.* A new trial seems a draconian remedy as the transcript of the trial might enable mental health professionals to arrive at opinions about Simpson's mental state at the time of trial. The decisional law has not, however, accepted the notion of a retrospective competence hearing. The cases so decide in part because an individual in Simpson's situation cannot now (or, perhaps more to the point, in the future) be observed as he appeared and sounded in 1994 at his trial. Simpson is entitled to a new trial preceded by a hearing on, and determination of, his competence to stand trial and to conduct his own defense. See *Dusky* v. *United States*, 362 U.S. at 403; *Pate* v. *Robinson*, 383 U.S. 375, 386-387 (1966); *Drope* v. *Missouri*, 420 U.S. at 183; *Commonwealth* v. *Hill*, 375 Mass. at 62; *Commonwealth* v. *Rise*, 7 Mass. App. Ct. at 108.

3. *Waiver of competence hearing.* Throughout his trial and this appeal, Simpson has wanted no part of a defense based on lack of mental responsibility. Perhaps Simpson has a right, as a free citizen, to waive a defense that he regards as false and degrading; perhaps he should be allowed to cling to the shards of his human dignity as he chooses. Waiver, however, assumes a conscious, rational, and voluntary act, i.e., one that assumes competence. See *Commonwealth* v. *Hill*, 375 Mass. at 53. A defendant cannot logically be incompetent "and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." *Pate* v. *Robinson*, 383 U.S. at 384. This conclusion may have less to do with the rigors of a State prison, as compared to the tender mercies of a State mental institution,[5] than our sense that only an individual linked to a rational world can recognize and conform to the moral line that must be

---

[5]In his statement prior to sentencing, Simpson told the judge that the victim, as part of the over-all conspiracy against him, had conspired to send him to an "insane asylum" to get rid of him. His fear of being trapped in an "insane asylum" was so acute that he chose to serve an additional ten to fifteen years in State prison rather than submit to psychological evaluation as a condition of probation. His apprehensions about commitment to a State mental institution, although intuitive, were not inconsistent with the observations of a

crossed to commit a crime and can, thereafter, stand trial. See *Frendak* v. *United States*, 408 A.2d 364, 374 (D.C. 1979); *United States* v. *Marble*, 940 F.2d 1543, 1544 (D.C. Cir. 1991).

If Simpson, after hearing, is found competent to stand trial, a related question is whether the judge may impose the defense Simpson has consistently rejected, that of insanity. This again touches on the question of the defendant's autonomy. Refusal to admit mental illness, as we have had occasion to observe, is not invariably a manifestation of the illness itself. *Commonwealth* v. *Blackstone*, 19 Mass. App. Ct. 209, 211 (1985). That Simpson might be competent to stand trial and might competently decline to invoke an insanity defense is a possibility. He might, for example, choose to plead guilty, rationally preferring a sentence in prison, with prospects of parole, rather than indefinite incarceration in a State mental institution.[6] If, on the other hand, his rejection of an insanity defense forms a basis for finding that Simpson does not rationally recognize the circumstances of his assault on the victim, as opposed to pretending that he does not recognize them, then the dial on the circle of examination will once again be pointing at lack of mental responsibility and, hence, in the particular circumstances, at incompetence to stand trial. In that event the commitment machinery of G. L. c. 123, § 16, begins to operate.

Competence to stand trial, as we have seen, includes the ability of a defendant to assist and consult with counsel in the preparation of the defense. That task requires discussion of facts (e.g., the victim had me cornered and was swinging a baseball bat at me) and strategy (e.g., shall we invoke an insanity defense). An individual in the thrall of a persisting paranoid delusion may continue to see himself as the target of attack and, thus, as having the right to stab his oppressor, although no objective facts support the construct of hostility against the defendant by the victim. A so deluded defendant cannot assist counsel in preparation of the defense and, therefore, is incompetent to stand trial. See discussion in *State* v. *Kahn*, 175 N.J. Super. at 83.[7] In neither of the scenarios we have considered, the rational rejection of an insanity defense or the

---

rational observer. See, e.g., Fried, Impromptu Remarks, 76 Harv. L. Rev. 1319 (1963).

[6]See G. L. c. 123, § 16.

[7]In the *Kahn* case, the defendant shot to death a man the defendant said was part of a conspiracy against him.

irrational rejection of that defense, do we think the trial judge should require of defense counsel that an insanity defense be made.[8] In the one case, the rational rejection, the autonomy interest of the defendant is paramount; in the other case, the irrational rejection, the defendant will not stand trial.

4. *Competence to waive assistance of counsel.* As an alternative, the judge may decide there is sufficient connection between the defendant and reality so that the defendant is competent to stand trial but is not competent to waive assistance of counsel and conduct his own defense. Two of our cases have recognized that the standard of competence to waive counsel and appear pro se is a degree higher than the standard of competence to stand trial, i.e., the test for competence to waive counsel and appear pro se contains an additional ingredient. *Commonwealth* v. *Barnes*, 399 Mass. at 389 n.3. *Commonwealth* v. *Wertheimer*, 19 Mass. App. Ct. at 931. See *United States ex rel. Konigsberg* v. *Vincent*, 526 F.2d 131, 133 (2d Cir. 1975), cert. denied, 426 U.S. 937 (1976). In addition to having a rational and factual understanding of the proceedings in which he is involved and the proceedings against him, the defendant must be shown to have an awareness of the magnitude of the task confronting him and the disadvantages of representing oneself. *Commonwealth* v. *Barnes*, 399 Mass. at 391. This does not, however, require a demonstration that the defendant have any particular skill or training. *Commonwealth* v. *Martin*, 425 Mass. 718, 720 (1997). The focus of the inquiry is on rational understanding, not legal ability. *Godinez* v. *Moran*, 509 U.S. at 400.

5. *Conclusion.* The judgments are reversed, the verdicts are set aside, and the case is remanded for an evidentiary hearing concerning Simpson's competence to stand trial and competence

---

[8]Among the States, there has been division about whether a trial judge should impose an insanity defense in behalf of an apparently insane defendant. Cases in which a trial judge was permitted to require an insanity defense include *Frendak* v. *United States*, 408 A.2d at 379; *State* v. *Fernald*, 248 A.2d 754, 761 (Me. 1968); *Walker* v. *State*, 21 Md. App. 666, 671 (1974); *State* v. *Paultz*, 299 Minn. 113, 117 (1974); *State* v. *Kahn*, 175 N.J. Super. 72, 80-82 (1980); *State* v. *Smith*, 88 Wash. 2d 639, 642-643 (1977). Cases which have held that a judge may not compel an insanity defense include *People* v. *Gauze*, 15 Cal. 3d 709, 717-718 (1975); *Boyd* v. *People*, 108 Colo. 289, 293-294 (1941); *People* v. *Gonzalez*, 20 N.Y. 2d 289, 294-295 (1967). In *United States* v. *Marble*, 940 F.2d at 1547, the court overruled a history of permitting imposition of the insanity defense on the ground that the Insanity Defense Reform Act of 1984, 18 U.S.C. § 17, had removed the technical and policy bases for imposing an insanity defense.

to conduct his own defense as to which, in each instance, an evaluation of mental responsibility may be a component. Should he be found competent to stand trial, there can be a new trial. Should he be found incompetent to stand trial, he shall be committed to Bridgewater State Hospital or another facility (within the meaning of that term under G. L. c. 123, § 1) in accordance with the procedures set forth in G. L. c. 123, § 16. For the reasons stated by her, the order of the single justice is affirmed.

*So ordered.*

APPENDIX.

We treat summarily the points raised by Simpson in his brief on appeal:

The striking of the victim in the head with a hammer and the subsequent stabbing with a knife and the slash across the face could be viewed as separate acts warranting separate indictments and convictions for assault with intent to murder and mayhem. *Commonwealth* v. *Hamm,* 19 Mass. App. Ct. 72, 80-81 (1984). The crimes are not inconsistent and the separate charges are not duplicative. *Ibid.* See *Commonwealth* v. *Graves,* 35 Mass. App. Ct. 76, 88-89 (1993). The offenses of assault with intent to murder and assault and battery with a dangerous weapon, for which the judge imposed concurrent fifteen to eighteen year sentences, were separate offenses from mayhem (see above), and it was therefore not unlawful for the judge to have imposed a consecutive sentence of from ten to fifteen years for mayhem. We have considered the eleven additional points put forward on behalf of the defendant on a *Moffett* basis (see *Commonwealth* v. *Moffett,* 383 Mass. 201, 209 [1981]). They have no merit and require no comment.

SPINA, J. (dissenting). I respectfully dissent. Today we decide that an otherwise competent defendant is rendered incompetent by virtue of a delusion based mental illness that we presume gives rise to a defense of lack of criminal responsibility and simultaneously prevents him from recognizing and therefore assisting in the presentation of that defense. We do so without ever having heard from the parties as to the correctness or wisdom of such a far-reaching precedent.

The judgment should be affirmed for the reasons set forth in the Appendix to the majority opinion. Since the defendant never raised the issue of his competence either at trial or on appeal, it is not for us to act on his behalf. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). *Commonwealth* v. *Vincente,* 405 Mass. 278 (1989). *Commonwealth* v. *Hampton,* 26 Mass. App. Ct. 938 (1988). Neither the experienced trial judge,

stand-by defense counsel, nor the prosecutor ever expressed any concern about the defendant's competence during trial.

If the defendant decides to pursue the issue of his competence to stand trial, the open course is to move for a new trial pursuant to Mass.R.Crim.P. 30(b), 378 Mass. 900 (1979). See *Commonwealth* v. *Hill*, 375 Mass. 50, 52 (1978).