2003 UT 1

STATE of Utah, Plaintiff and Appellee,

v.

Roberto V. ARGUELLES, Defendant and Appellant.

Nos. 970364, 970366.

Supreme Court of Utah.

Jan. 14, 2003.

Rehearing Denied Jan. 16, 2003.

Mark L. Shurtleff, Att'y Gen., Thomas Brunker, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Edward K. Brass, Salt Lake City, attorney for the court.

## AMENDED OPINION

DURHAM, Chief Justice:

¶ 1 This case presents the unusual situation wherein a capital defendant seeks the death penalty for his crimes. The defendant,

Roberto V. Arguelles ("Arguelles"), pled guilty to four counts of aggravated murder. During the penalty phase, Arguelles waived his right to counsel, acknowledged that he felt the death penalty was the appropriate punishment for him, and presented limited mitigating evidence. The court sentenced defendant to death. Now before us on mandatory statutory appeal, the court assistant[1] claims on Arguelles's behalf that the death sentence should be overturned.

## BACKGROUND

¶ 2 On April 26, 1996, Arguelles confessed to kidnapping and killing Margo Bond, Stephanie Blundell, Lisa Martinez, and Tuesday Roberts. Three days later, Arguelles was charged with four counts of aggravated murder. Two attorneys from the Salt Lake Legal Defenders Association ("LDA") were appointed to represent Arguelles. On September 25, 1996, the LDA was disqualified by the magistrate because of potential and actual conflicts of interest.

¶ 3 In January 1997, the magistrate appointed Edward Brass ("Brass"), Patrick Anderson ("Anderson"), and Clark Donaldson ("Donaldson") to represent Arguelles. Three months later, in a hearing before the magistrate, Arguelles waived his right to counsel and accepted Brass, Anderson, and Donaldson as standby counsel. In the same hearing, Arguelles waived his right to a preliminary hearing and attempted to plead guilty. The magistrate entered not-guilty pleas on Arguelles's behalf, then bound him over to the district court.

¶ 4 Arguelles reaffirmed his desire to represent himself in a hearing before the district court, then pled guilty to each count of aggravated murder. Arguelles also explicitly waived his right to a jury trial for the sentencing phase. During the three-day penalty proceeding which followed, the State presented evidence of Arguelles's prior offenses, details of the charged murders, and the testimony of the victims' family members. As mitigating evidence, Arguelles presented the testimony of Jenny Glover, a corrections in-

---

1. By statute, this court reviews all capital cases in which a death sentence is reached. Utah Code Ann. § 76-3-207 (2001). Since Arguelles does not oppose his sentence, and since he has waived his right to counsel, the court assistant was appointed to argue the case on appeal.

vestigator and peace officer, who testified regarding Arguelles's confession and his help in locating the victims' bodies. Arguelles also presented evidence of examinations and reports describing his history of blackouts, memory loss, and associative disorders. After weighing the aggravating and mitigating evidence, the trial court sentenced Arguelles to death.

¶ 5 In August 1998, pending automatic appeal to this court, Arguelles attempted suicide while in prison. The State moved to have the case remanded to the district court for an evidentiary hearing on Arguelles's mental competency to proceed. Conflict counsel Jim Bradshaw and Ken Brown were appointed for the hearing. The district court found Arguelles competent to proceed. After Arguelles indicated that he did not wish to appeal his sentence, Brass was appointed as a court assistant to handle the statutorily required appeal. We discuss in greater detail below the facts surrounding each of the issues raised by the court assistant in this appeal.

## I. BEFORE THE MAGISTRATE

¶ 6 Early in the proceedings, the magistrate appointed the LDA to represent Arguelles. In June 1996, the State moved to have the magistrate inquire into the LDA's potential conflicts of interest. The State argued that two LDA employees, Robert Steele ("Steele") and Virgil Johnson ("Johnson"), would be necessary witnesses to the trial, creating a conflict of interest. Steele, an LDA attorney, had represented Arguelles and been present when Arguelles confessed to the four crimes charged. Johnson, an LDA investigator, was previously employed by the Salt Lake County Sheriff's Office and had investigated an earlier case in which Arguelles was convicted of attempted murder and aggravated assault. At the hearing, the LDA attorneys argued that there was no conflict and that the State was using the motion as a "ruse." Arguelles testified that he would waive any conflict. At the end of the hearing, Arguelles told the magistrate, "I just want you to know that I will not be accepting other counsel and going through all this again with new counsel. I'll represent myself if it comes to that."

¶ 7 The magistrate determined that the State did not establish a compelling need for Steele's testimony about the voluntariness of Arguelles's videotaped confessions because there were other witnesses present at the confession, and that Steele's evidence would be cumulative and not necessary to preserve the cause of action. The trial court also determined that Johnson was not a necessary party to establishing Arguelles's prior conviction, but that Johnson's knowledge of aggravating factors to be brought out during the sentencing phase of the trial created a conflict of interest that Arguelles could not waive.

¶ 8 In determining that a conflict of interest existed as to Johnson, the trial court found that his potential testimony would be both compelling and necessary. The testimony was compelling because "Mr. Johnson's numerous conversations with the defendant directly impact on the issue of aggravating circumstances and the presentation of those circumstances to the jury. The defense has conceded that Mr. Johnson has information that could address the aggravating circumstances." The court found that the testimony was necessary because it was: (1) adverse to the defendant; (2) admissible; and, (3) "the defense has not presented any alternative sources to defeat the State's claim that Mr. Johnson is the only source available for this information." The trial court further relied upon Utah Ethics Advisory Opinion 145, which states, "the law firm must avoid representing a defendant in a case in which its investigator substantially participated while employed by the State," and which cites Rule 1.7 of the Utah Rules of Professional Conduct precluding a "law firm from representing a defendant so long as the possibility exists that the investigator will testify." Because the State claimed that it planned to call Johnson as a witness, the trial court found that a conflict did exist. Finally, the trial court concluded that Arguelles could not waive the conflict because it was based upon an issue of divided loyalty, which "dem-

onstrates a denial of the right to have effective assistance of counsel." [2]

¶ 9 Two months after the LDA was disqualified, Arguelles filed his own pro se motion to disqualify the prosecutors, which was denied. Soon thereafter, the magistrate appointed attorneys Brass, Donaldson, and Anderson to represent Arguelles. A month later, Arguelles filed a pro se motion to dismiss his court-appointed counsel and to represent himself.

¶ 10 In an April 23, 1997, hearing, the magistrate conducted a waiver of counsel colloquy with Arguelles, questioning him to determine whether he understood what was happening at the hearing and whether he fully understood the consequences of electing to represent himself and of waiving counsel. During this colloquy, the magistrate informed Arguelles of his right to be represented by an attorney and informed Arguelles of the charges he was facing and the possible sentences accompanying the charges. The magistrate told Arguelles about the court rules he must follow and that he could not "simply take the stand and proceed by telling a story." The magistrate also advised Arguelles that it was "unwise" for Arguelles to represent himself.

¶ 11 Arguelles answered the numerous questions clearly and affirmed that he believed himself to be "of sound and discerning mind, mentally capable of understanding the proceedings and the consequences of [the waiver] and [his] pleas, and free of any mental disease or defect or impairment ...." The court assistant was present at the hearing in the capacity of standby counsel and did not raise any concerns about Arguelles's mental competence. Nevertheless, the magistrate asked standby counsel, "Has the defendant manifested to you any—any actions that would lead you to believe that he is not knowingly, voluntarily, intelligently waiving his right to counsel at this time?" Standby counsel responded, "No." After this colloquy,

the court found that Arguelles had waived counsel knowingly, intelligently, and voluntarily. The magistrate appointed Brass, Donaldson, and Anderson to remain in the case as standby counsel to Arguelles.

¶ 12 During the same hearing, Arguelles waived his right to a preliminary hearing and the magistrate again asked Arguelles if he believed himself "free from any mental disease, defect or impairment that would prevent [him] from knowingly, intelligently and voluntarily entering into this waiver?" Arguelles responded, "I do." The State then asked whether standby counsel had discussed the waiver with Arguelles and whether, in standby counsel's opinion, Arguelles understood the waiver. Standby counsel answered, "I've discussed that subject with him many times. I've not discussed this form with him. It's not my desire to participate in the waiver of the preliminary hearing. You can see that he's a bright—I was going to say young male. I guess that's relative. He's capable of understanding that form, in my opinion." The magistrate pressed standby counsel further, asking, "We'll accept your representation that you do not believe that it's appropriate to participate in this waiver but that you have discussed with the defendant his desires and explained to him what he'll be giving up by entering into this waiver; is that correct?" "That's true," responded standby counsel. The magistrate thus concluded that Arguelles had made a knowing, voluntary waiver of a preliminary hearing and that he understood all of his rights.

¶ 13 At the end of the hearing before the magistrate, the magistrate entered not-guilty pleas for Arguelles, and the case was bound over to the district court.

## II. BEFORE THE DISTRICT COURT

¶ 14 In Arguelles's first hearing before the district court on May 12, 1997, the court assistant was again present as standby coun-

---

**2.** At the July 31, 1996, hearing on the State's motion to disqualify counsel, Arguelles told the trial court:

Regardless of who testifies to my past, and I know I have a bad past, the testimony's going to be the same, and it's all documented. And I have no problem with Virgil Johnson or any-

body else coming forward and testifying to that, so long as it has to do with the accuracy and the honesty of the opinions that are in that. And I know Mr. Virgil Johnson's opinion of me there. And, personally, I think it's justified. And I don't see no conflict with him giving them facts or delivering them facts.

sel.[3] The trial court conducted another self-representation and guilty plea colloquy with Arguelles, again assessing that Arguelles believed he was of "sound and discerning mind" and was "mentally capable of understanding the proceedings and the consequences" of his choice to waive counsel. The judge also inquired into the circumstances of Arguelles's choice to represent himself and the previous disqualification of Arguelles's counsel. Arguelles gave a description of the procedural history leading up to the disqualification of the LDA. When asked if he was now requesting representation by the LDA and waiving the conflict, Arguelles answered, "[W]ell, I have these attorneys now, and I am easier just to continue with these attorneys now as stand-by counsel." The judge reiterated, "[Y]ou're comfortable with that procedure?" "Yes," responded Arguelles. Referring to Arguelles's decision to represent himself, the judge asked him, "Is there anything in your mind that is causing you to feel for any reason that you are not being placed in a posture where you can properly present your case?" "No," responded Arguelles. "So you believe that you can properly present your defense in this case; is that correct?" asked the judge. "I do," replied Arguelles.

¶ 15 After Arguelles entered his guilty plea, the court read aloud each of the four charges, asked Arguelles to confirm the accuracy of the charges, and confirmed that Arguelles understood the nature and elements of the charges, his rights, and the consequences of pleading guilty. Arguelles demonstrated that he understood the charges when he responded appropriately, corrected the content of the charges as to one of the victims, and asked for clarification when he was unsure how to answer.[4] Once again, the trial court asked Arguelles whether he believed he was mentally competent and whether he understood both the proceedings and the consequences of his pleas. Arguelles indicated that he was competent and that he understood the charges and the proceedings. The

trial court found that Arguelles pled guilty to each count knowingly, voluntarily, and intelligently, and that he had waived the jury for the penalty portion of the trial fully knowing the consequences of his choice.

¶ 16 At no time during this hearing or during any pre-trial hearings did standby counsel raise concerns about Arguelles's competence. Additionally, when the court asked standby counsel whether he had any questions regarding Arguelles's decision to waive a jury for the penalty phase, standby counsel replied "[b]oy, there are many questions I'd ask you to ask, but this is his decision and I respect it. So, no." Once again, the trial court found that Arguelles had knowingly made a voluntary and intelligent waiver of counsel and the right to a jury, and standby counsel made no objection.

¶ 17 At the end of the hearing, the trial court explicitly asked standby counsel "[D]o you have any concerns?" Standby counsel asked to be informed of the evidence the State was planning to present and noted that he might need the court's assistance in gaining access to Arguelles after hours. He made no mention of concern over Arguelles's mental competence, Arguelles's ability to represent himself, or his ability to plead guilty.

¶ 18 One week prior to the penalty phase hearing, Arguelles, with standby counsel's help, filed a motion to prohibit photography during the penalty phase. Arguelles argued that taking his photograph in court would be "very distracting and irritating" and would infringe on his ability to represent himself. Arguelles indicated in an affidavit that he would "refuse to appear in the courtroom if the news media [were] allowed to take [his] photograph during the upcoming proceedings."

¶ 19 This motion was argued by standby counsel and Arguelles on the first day of the penalty phase hearing. Arguelles reasserted that the photography was distracting and

---

3. The court assistant, Brass, was still serving in the capacity of standby counsel and was joined by co-counsel Donaldson. Anderson, the third attorney assigned as standby counsel, was not present at the hearing.

4. For example, Arguelles asked the judge whether his agreement to plead guilty in exchange for the prosecutor's promise to seek the death penalty constituted a threat, coercion, or unlawful influence.

stated he did not want to spend time avoiding the camera when he "should be paying attention to what's going on." Counsel for the media argued to have one discreet, quiet-shutter camera placed in the back, under the court's control. The judge denied Arguelles's motion but stated, "[W]e'll see how it goes." The judge ordered Arguelles to stay in the courtroom after he threatened to leave.

¶ 20 Immediately after the motion to prohibit photography was denied, Brass, acting as standby counsel, argued a motion to exclude victim impact evidence.[5] After the argument, Brass told the court that Arguelles had "missed at least 50 percent of what we each had to say because he's troubled by this photography that's taken place." The judge agreed that it was distracting, but only "modestly" distracting. On the second day of the hearing, while Arguelles was cross-examining a witness, Arguelles asked the cameraman if he "[c]ould ... knock that off, please." The judge then asked the cameraman to "hold the camera." After Arguelles finished his cross-examination, the judge told the cameraman there was "no further prohibition on the camera."

¶ 21 During the three-day penalty phase, the State presented evidence of aggravating factors, including evidence of Arguelles's prior crimes and the specific circumstances of the charged crimes. For mitigation, Arguelles called one witness—the officer to whom he initially confessed—and offered reports, tests, and notes of his medical and psychological history. Throughout the penalty phase, Arguelles represented himself with some assistance from standby counsel.

¶ 22 The State first presented evidence of Arguelles's prior crimes. In October 1977, when he was fifteen, Arguelles was convicted of car and gas theft. In October 1978, Arguelles committed sexual abuse of a ten-year-old girl, a third degree felony. He was convicted of this crime in March 1979. Arguelles raped a sixteen-year-old girl in February 1979. This case was dismissed because of Arguelles's conviction on the earlier sex abuse charge.[6] In May 1980, Arguelles was convicted of aggravated sexual assault of a fifteen-year-old girl, a first degree felony, and was also convicted of attempted capital homicide of another fifteen-year-old girl, a first degree felony. While incarcerated, Arguelles escaped from custody for approximately forty-five minutes. He was not convicted of escape at the time of the crime.[7] Arguelles was released on parole on June 25, 1991. Arguelles returned to prison in August 1992, after being convicted of two counts of aggravated sexual abuse of two young children.

¶ 23 In the second phase of the aggravation case, the State presented evidence of the charged murders. In his 1996 confession, Arguelles stated that on February 21, 1992, he abducted forty-two-year-old Margo Bond from the school where she worked, drove her to the west desert in Tooele County, sexually assaulting her on the way, then removed her clothes, bound her, strangled her to death, and buried her body.

¶ 24 On March 19, 1992, Arguelles offered thirteen-year-old Stephanie Blundell a ride, drove her to Timpanogos Canyon, sexually assaulted her, strangled her to death, and then buried her.

¶ 25 On March 30, 1992, Arguelles offered fourteen-year-old Tuesday Roberts and sixteen-year-old Lisa Martinez a ride, then drove them to a nearby school. Arguelles handcuffed the girls together and attempted to sexually assault Lisa. When Lisa resisted, Arguelles stabbed her repeatedly with a wood chisel, killing her.[8] Arguelles then took Tuesday to a different location and sexually assaulted her. He took Tuesday back to the school field to pick up Lisa's body, drove to a pig farm, strangled Tuesday to

---

5. This motion was denied.

6. The trial court found beyond a reasonable doubt that Arguelles committed the rape.

7. The trial court found beyond a reasonable doubt that Arguelles committed the crime of escape, a second degree felony.

8. The medical examiner testified that he found forty-three sharp force injuries and eighteen blunt force injuries on Lisa's body.

death, and then buried the two bodies at the farm. Arguelles confessed that one reason he killed Tuesday was because he did not want there to be any witnesses to the initial crime.

¶ 26 The State called a family member of each of the four murder victims to testify about the murder and the impact it had on their family.

¶ 27 Warren Bond, husband of Margo Bond, testified that he last saw his wife on February 21, 1992, before she went to work at Kennedy Junior High School. Four months later, her body was found. Margo had two sons and one granddaughter. He described Margo as being "high on life." She was the Ms. Utah Body Builder Champion and loved golfing, bike riding, and camping. Mr. Bond stated, "not only did I lose my wife, but I lost my best friend .... I had lost everything."

¶ 28 Elaine Blundell, Stephanie Blundell's mother, testified that she last saw her daughter on March 19, 1992, before she left for school. Stephanie's body was found four years later. Stephanie had one sister and one brother, was "bubbly" and "very outgoing." When asked how the murder had impacted the family, Elaine replied that "[i]t basically tore us apart."

¶ 29 Veronica Juarez, Lisa Martinez's sister, testified that she last saw her sister and her sister's friend, Tuesday Roberts, on March 30, 1992, before they left the house together. Lisa and Tuesday's bodies were found three and a half years later. Lisa was the oldest of four daughters. Veronica testified that Lisa "wanted to try out to be a cheerleader, but she never got the chance to do that." When asked what effect the murder has had on her, Veronica stated that "[s]he was like my best friend and now she's not there no more."

¶ 30 Shawn Roberts, Tuesday Roberts' brother, testified that Tuesday was the youngest of four. She was "involved in dance, softball ... and liked drawing." Shawn testified that the murder "changed everything.... It's really hit us hard." He stated, "[i]t's like I've lost a limb."

¶ 31 In mitigation, Arguelles presented one witness, five documents containing medical and psychological information, and a handwritten sheet of mitigating factors for the judge to consider. Arguelles had indicated earlier that he would present "very little, if any" mitigation evidence.

¶ 32 At Arguelles's request, Brass examined Jenny Glover, a department of corrections investigator and peace officer. Arguelles initially spoke with Glover about the Roberts and Martinez murders before finally confessing to each of the four murders charged. He then showed investigators where the bodies of Martinez, Roberts, and Blundell were located.[9] Glover testified that it was her belief that had Arguelles not confessed, the Martinez and Roberts murders would not have been solved and that "those bodies would never ever have been found." Glover also testified that Arguelles said he felt the only way to atone for the murders was through his execution.

¶ 33 Arguelles also presented a series of documents related to his medical and psychological background. In a 1980 police report, Arguelles's friend reported that Arguelles had a thirty-minute episode in which he thrashed on the friend's floor and yelled at her. A 1979 psychological evaluation stated that Arguelles had "very little understanding of ... his sexual offenses ... and on some occasions can't remember what happened." A 1988 psychological test stated that "there may be episodes in which this individual did not know what was being done, and later could not recall what had been done." The test also stated that Arguelles "most likely" had a personality disorder such as "antisocial, schizotypal, borderline paranoid schizoid." Two medical tests from 1994 and 1995 stated that Arguelles had complained of scalp numbness and memory loss.

¶ 34 At the end of his mitigation case, Arguelles asked the judge to "refer to the mitigating sheet that I handed into [sic] you." This three-page, hand-written document listed a series of "blackouts, memory loss, disasociative [sic] states" that the judge might consider when weighing aggravating and mit-

9. Bond's body was discovered independently four months after she was murdered.

igating factors. When asked by the trial court about the offered mitigating evidence, Arguelles responded, "It was indicated to me that by law it may well be remanded back to the court if I didn't offer the court some sort of mitigation. That's why the mitigation was offered."

¶ 35 After Arguelles had offered his mitigating evidence, the court asked Arguelles what his attitude was in relation to "further psychiatric or psychological examination." Arguelles indicated that he would refuse to cooperate if the trial court ordered any mental examinations.

¶ 36 In the trial court's findings of aggravating and mitigating factors, the court found eleven aggravating factors and four mitigating factors. The trial court stated that "[t]he testimony of the family members heard here as to their loss is both touching and enduring. The losses they feel daily are life altering to them.... To them the court expresses its compassion and concern." The trial court then found that the "aggravating circumstances outweigh, if not eclipse, the mitigating. The evidence justifying the death penalty is overwhelming." The trial court ordered Arguelles to be executed.

### III. POST–SENTENCING COMPETENCY HEARING

¶ 37 After Arguelles attempted suicide by hanging in August 1998, the case was remanded to the district court for a hearing on Arguelles's competency to proceed. At a hearing on May 3, 1999, Arguelles said he could not remember the events of the charged crimes and stated, "I know from what I read in the newspapers and stuff is what I know." Arguelles also said he could not remember events from the penalty phase proceedings. However, Arguelles still maintained that he knew he had committed the crimes and he wished to die for them. The district court ordered that Arguelles be evaluated by three psychiatrists and that conflict counsel be appointed to assist Arguelles with his desire to seek the death penalty, and with competency. Also at this hearing, Arguelles requested counsel to represent him during the competency proceedings. LDA attorneys

Jim Bradshaw and Ken Brown were appointed months later and represented Arguelles throughout the competency hearing.

¶ 38 Prior to a May 30, 2000, competency hearing, three psychiatrists, Drs. Gardner, Kovnick, and Bigler, interviewed Arguelles, conducted neuropsychological tests, and analyzed his psychological and medical background. Drs. Gardner and Kovnick diagnosed Arguelles with an antisocial personality disorder, and Dr. Bigler found that Arguelles had suffered an acute brain injury from the suicide attempt. However, each doctor found that Arguelles had a "sufficient present ability to consult with his attorney with a reasonable degree of rational understanding and [a] rational as well as factual understanding of the proceedings against him."

¶ 39 In interviews with Drs. Gardner and Kovnick, Arguelles stated that inmates and guards had put chemicals in his shampoo and toothpaste and had sent paint fumes into his cell. Neither doctor felt these thoughts rose to the level of delusion or paranoia, and neither felt they affected Arguelles's competency to consult with counsel or understand and make decisions regarding the proceedings. At the hearing, Arguelles testified about the incidents, and claimed that the inmates and guards were trying to make him actually incompetent or cause him to be found incompetent. Captain Jacobson, a corrections officer at the prison, testified that while he felt initially that Arguelles's claims of harassment were baseless, he later found bleach in Arguelles's shampoo and shampoo in Arguelles's toothpaste. He also stated that Arguelles was often taunted and ridiculed by other inmates.

¶ 40 At the competency hearing, Arguelles testified that he did not have a complete recollection of his earlier trial. He stated, "I remember that I went in, I pleaded guilty.... I remember asking for the death sentence." Arguelles maintained that he wanted to die "because [he] committed the crimes." He admitted that he and conflict counsel had "disagreements with stuff." When told that his conflict counsel were "vehemently opposed to the death penalty,"

Arguelles stated it was a problem only because he had not received paperwork he had requested from conflict counsel. At one point, Arguelles stated that counsel were "trying to keep things from" him. At the end of his testimony, Arguelles asked the judge to find him competent so that he would "be able to get the sentence carried out." After Arguelles testified, each doctor asserted that they still thought Arguelles was competent. Following the hearing, the trial court found that the "failure to remember some of the details" of the prior proceedings and the "potential conflict" between Arguelles and conflict counsel did not outweigh the conclusions of the doctors, and the court declared Arguelles competent.

## STANDARD OF REVIEW

¶ 41 The court assistant argues that we should adopt new rules for reviewing capital cases. We have often stated that " 'issues not raised at trial cannot be argued for the first time on appeal' .... unless the petitioner demonstrates that 'plain error' occurred or 'exceptional circumstances' exist." *Monson v. Carver*, 928 P.2d 1017, 1022 (Utah 1996) (quoting *State v. Lopez*, 886 P.2d 1105, 1113 (Utah 1994)). In capital cases, however, this court will review issues not raised below for plain error, unless the defendant invited the error at trial. *State v. Tillman*, 750 P.2d 546, 552–53 (Utah 1987); *State v. Parsons*, 781 P.2d 1275, 1285 (Utah 1989). Thus, while we will review issues in capital cases for plain error, we will not save a party from error when that party "has made a conscious decision to refrain from objecting or has led the trial court into error." *State v. Brown*, 948 P.2d 337, 343 (Utah 1997).

¶ 42 The court assistant urges us to abandon this precedent and perform de novo review of all issues in capital cases. We rejected this argument in *State v. Honie*, 2002 UT 4, ¶ 14, 57 P.3d 977. In asking that we overrule precedent, the court assistant bears "a substantial burden of persuasion." *State v. Menzies*, 889 P.2d 393, 398 (Utah 1994). The court assistant has made no new arguments to overturn this precedent, and we therefore decline to address the issue again.

¶ 43 The court assistant also asks this court to relax the obviousness requirement associated with plain error review. Again, the court assistant has failed to meet the "substantial burden of persuasion" necessary to overturn precedent. *Id.* The obviousness requirement strikes at the very heart of a plain error analysis, and relaxing this requirement would, in essence, create a new form of review no longer based upon manifest injustice. We have been given no reason to implement this new standard and decline to adopt it here.

## ANALYSIS

¶ 44 The court assistant makes a number of arguments on appeal. He argues (1) that the trial court should have, sua sponte, ordered a competency hearing early in the proceedings and should have rejected the testimony regarding competency offered at the post-sentencing competency hearing, (2) that the lower courts erred in permitting Arguelles to represent himself, (3) that the court improperly disqualified Arguelles's original counsel, (4) that the trial court erred in allowing the press to take photographs during the proceedings, (5) that the trial court improperly evaluated the aggravating and mitigating factors presented, (6) that the trial court improperly admitted victim impact evidence, (7) that Arguelles's right to a speedy appeal has been violated, and (8) that Utah's aggravated felony murder statute and death penalty scheme are unconstitutional. In addition to addressing the court assistant's claims of error, we also note several instances in which the court assistant's arguments fail to comply with the rules of appellate procedure.

### I. COMPETENCY

¶ 45 The court assistant argues that the defendant was not competent and that the magistrate and trial court should have required a competency hearing early in the proceedings. In addition, the court assistant claims the trial court erred in concluding, after holding a competency hearing after Arguelles was sentenced, that defendant was competent to proceed. Because neither

claim was raised below, we review these claims for plain error.

## A. Duty of Trial Court to Require Competency Hearing Sua Sponte

¶ 46 The court assistant argues that the magistrate and trial court should have, sua sponte, ordered a competency evaluation when Arguelles pled guilty, waived his preliminary hearing, and waived his right to counsel. The court assistant claims that the court's failure to do so violated Arguelles's due process rights. We discuss here Arguelles's competence to plead guilty and waive a preliminary hearing; we discuss his competence to waive counsel in the next section. *See* section II, *infra.*

¶ 47 It is well established that due process requires that a defendant be mentally competent to plead guilty and to stand trial. "A mentally incompetent defendant can provide no defense, and proceedings against such a defendant do not comport with due process." *Jacobs v. State,* 2001 UT 17, ¶ 12, 20 P.3d 382 (quoting *State v. Young,* 780 P.2d 1233, 1236 (Utah 1989)); *see also York v. Shulsen,* 875 P.2d 590, 594 (Utah Ct.App. 1994) ("Due process requires that a defendant be competent to plead guilty."); *Drope v. Missouri,* 420 U.S. 162, 172, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) (stating that prohibition against subjecting mentally incompetent defendant to trial is fundamental to adversarial system of justice).

¶ 48 Section 77–15–1 of the Utah Code mandates that "[n]o person who is incompetent to proceed shall be tried for a public offense." Utah Code Ann. § 77–15–1 (2002). Section 77–15–2 defines a defendant's incompetency to proceed as an "inabil-

ity to have a rational and factual understanding of the proceedings against him or of the punishment specified for the offense charged; or . . . his inability to consult with his counsel and to participate in the proceedings against him with a reasonable degree of rational understanding." Utah Code Ann. § 77–15–2(1)–(2) (2002). We have held that "[i]n determining whether a defendant is competent to plead guilty, the trial court must consider whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *State v. Holland,* 921 P.2d 430, 433 (Utah 1996) (internal quotations omitted) (citing *Godinez v. Moran,* 509 U.S. 389, 396, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993)). " '[C]ompetency is established when a defendant can, but not necessarily will, assist or consult with counsel.' " *State v. Lafferty,* 2001 UT 19, ¶ 51, 20 P.3d 342 (quoting *State v. Woodland,* 945 P.2d 665, 668 (Utah 1997)).

¶ 49 The procedures for alleging incompetence are explained in the statutory scheme. Whenever a defendant is or becomes incompetent to proceed, a petition may be filed with the court by defense counsel, the defendant, any person acting on the defendant's behalf, the prosecuting attorney, or any person who has custody or supervision over the defendant. Utah Code Ann. § 77–15–3 (2002). Furthermore, while section 77–15–4 allows the court to "raise the issue of the defendant's competency at any time," we have held that the trial court has no statutory duty to order a competency hearing in the absence of a petition. *State v. Bailey,* 712 P.2d 281, 285 (Utah 1985).[10] Thus, we have determined that in the absence of a competency petition, "[a] trial court must hold a

---

10. Relying upon *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), and *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), the court assistant suggests that United States Supreme Court precedent requires the trial court to "order a competency evaluation" when "a defendant is suicidal and has a history of mental illness." In *Bailey,* however, we expressly distinguished Utah's competency statute from the state statutory schemes the United States Supreme Court analyzed in *Pate* and *Drope.* We stated:

> The decisions in both *Pate* and *Drope* were based on state statutes which require that a judge order a competency hearing on his own motion if there is a "bona fide doubt" as to competence, or if the judge has "reasonable cause" to believe the defendant may not be competent. In contrast, Utah's statute does not establish a standard by which inquiry into competence is required; further, an order for a hearing is mandatory only on the filing of a petition.

*Bailey,* 712 P.2d at 285 (citations omitted).

competency hearing when there is 'a substantial question of possible doubt as to a defendant's competency at the time of the guilty plea.'" *Jacobs v. State*, 2001 UT 17, ¶ 13, 20 P.3d 382 (quoting *State v. Holland*, 921 P.2d 430, 435 (1996)).

¶ 50 The issue before us, therefore, is whether there was a "substantial question of possible doubt" as to Arguelles's competence either when he pled guilty or in the pre-trial proceedings before the magistrate and the trial court.[11] In determining whether the lower court should have ordered a competency hearing, we "'consider only those facts that were before the [trial] court when the plea was entered.'" *Jacobs*, 2001 UT 17 at ¶ 18, 20 P.3d 382 (modification in original) (quoting *York*, 875 P.2d at 595). We thus examine the record to determine whether facts existed that should have created a substantial question of doubt as to Arguelles's competence to proceed, absent a petition to assess his competency.

¶ 51 In a hearing before the magistrate, a colloquy was conducted to determine whether Arguelles understood the consequences of waiving his right to a preliminary hearing. Arguelles affirmed that he believed himself capable of understanding the proceedings and the consequences of the waiver. The court assistant agreed.

¶ 52 In Arguelles's first hearing before the district court, the court conducted a guilty plea colloquy with Arguelles and discussed Arguelles's waiver of his right to a jury. Arguelles again confirmed his competency.

¶ 53 The record shows that Arguelles was coherent during each of the hearings before the magistrate and the trial court, that he responded to questions appropriately, and asked his own questions intelligently. Arguelles repeatedly affirmed his choice to waive the preliminary hearing, plead guilty, and

waive a jury during the penalty phase. He indicated by words and actions that he understood the proceedings, and he fully participated in the hearings. The trial court found that Arguelles made knowing, voluntary, and intelligent waivers for each of his decisions. Furthermore, the magistrate and the trial judge had ample opportunity to observe Arguelles's demeanor and behavior in the courtroom. The record shows that Arguelles exhibited no mental defects at the hearings, that he understood the proceedings, answered the questions posed, and participated in the hearings. Neither standby counsel nor the State expressed any concern over Arguelles's competence to proceed, nor does the record contain any indication that he was not competent.[12]

¶ 54 Absent a petition, neither the magistrate nor the trial court was required to order a competency hearing where Arguelles appeared to clearly understand the proceedings and had the ability to consult with counsel about his case. We therefore find no violation of Arguelles's due process rights under *Jacobs, Holland*, or section 77–15–1 of the Utah Code.

### B. Post–Sentencing Competency Evaluation

¶ 55 More than two years after Arguelles was sentenced to death, he attempted suicide while in prison. The court then ordered competency evaluations of Arguelles and a hearing to determine whether he was still competent to proceed. After hearing from several experts, the court determined that Arguelles was competent.

¶ 56 The court assistant claims that the competency evaluations of Arguelles were "patently inadequate" and that the court erroneously found Arguelles competent

---

11. We have previously clarified that:
 The same standard applies to both a determination of competency to plead guilty and a determination of competency to stand trial. *Compare Holland*, 921 P.2d at 433 (guilty plea), *with Young*, 780 P.2d at 1236 (stand trial); *see also York v. Shulsen*, 875 P.2d 590, 594 (Utah Ct.App.1994) (noting that "[t]he test for competency to plead guilty is the same as competency to stand trial").

*Jacobs*, 2001 UT 17 at ¶ 15 n. 3, 20 P.3d 382.

12. The court assistant's claims on appeal that Arguelles was incompetent are problematic, considering that, when acting as standby counsel at the hearings, the assistant not only failed to raise competency concerns but affirmatively stated that he thought Arguelles was competent.

to proceed.[13] He asserts that Arguelles should be deemed incompetent to direct his appeal.

### 1. Adequacy of Competency Evaluations

 ¶ 57 We review for plain error whether the trial court should have deemed the competency evaluations inadequate. The court assistant first claims that the evaluations were not thorough enough. He complains that none of the examiners were familiar with Arguelles prior to his suicide attempt, that the evaluators interviewed Arguelles too briefly, and that only one of the evaluators used formal testing techniques with Arguelles. Citing *Hays v. Murphy*, 663 F.2d 1004 (10th Cir.1981), the court assistant claims that Arguelles's background of mental illness mandated a more in-depth examination.

¶ 58 In *Hays*, the court held that, where there was significant evidence that defendant had a serious mental disease, it was error for the trial court to base its ruling upon competency evaluations that were clearly inadequate. *Id.* at 1005. The facts of *Hays*, however, are quite different from the current case. First, there is not as much evidence of incompetence in the current case as there was in *Hays*. In *Hays*, there was uncontradicted evidence that defendant had been the subject of several mental commitment proceedings in the preceding years, that he had attempted suicide, that he had suffered

lengthy alcoholism, and that he had possibly sustained a concussion. *Id.* at 1009. In addition, the defendant had exhibited bizarre behavior in court proceedings, had been diagnosed with schizophrenia while in prison, and expressed obviously delusional thinking. *Id.* at 1009–10 & n. 10. In the current case, by contrast, while Arguelles has manifested suicidal tendencies and possibly some mild paranoia,[14] there is no reason to presume that he is delusional.

¶ 59 Second, the evaluations relied upon in *Hays* were much less thorough than the ones relied upon in this case. In *Hays*, the trial court's finding of competence was based primarily upon the report of a single, 30–minute interview conducted by four staff members, three of whom had never before interviewed defendant. *Id.* at 1011 & n. 12. During the interview, the evaluators did not ask questions standard in the diagnosis of schizophrenia, but engaged in only a superficial inquiry into matters such as the time of day. *Id.* The interview took place on a noisy prison cell block, and no psychological tests were administered. *Id.* at 1011–12 & n. 12. In the current case, on the other hand, the evaluators studied Arguelles's past mental and physical history and then spent a total of eight hours with him,[15] inquiring into his thought processes and evaluating his capabilities. Thus, unlike *Hays*, we do not find that the evaluations were so haphazard, or the evidence of Arguelles's mental illness so

---

**13.** Before the hearing, the court appointed separate counsel to represent Arguelles in the competency proceedings. During the competency hearing, neither Arguelles nor his counsel raised a claim that the evaluations were inadequate. The court assistant now asserts that there was a conflict between Arguelles and the counsel appointed to represent him at the hearing. The court assistant does not state what remedy he thinks this alleged conflict warrants, but we presume that he raises the conflict either to avoid the invited error doctrine or to reverse the trial court's factual findings. The court assistant, however, has failed to identify the nature of this alleged conflict; that is, he has failed to show " 'that the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests.' " *State v. Taylor*, 947 P.2d 681, 686 (Utah 1997) (quoting *United States v. Acevedo*, 891 F.2d 607, 610 (7th Cir. 1989)). Indeed, the court assistant admits that he is uncertain what the precise nature of this alleged conflict was. The mere possibility of a

conflict is not enough to warrant reversal of the trial court's findings. *See United States v. Gallegos*, 39 F.3d 276, 278 (10th Cir.1994). To warrant reversal, the assistant must show that an actual conflict existed and that the conflict prejudiced defendant. *See, e.g., State v. Lovell*, 1999 UT 40, ¶ 22, 984 P.2d 382. The assistant is apparently unable to show either. Finally, since we do not treat the failure to object as invited error but review the hearing under the plain error doctrine, a finding that there was a conflict would not affect our standard of review.

**14.** The evidence suggests that Arguelles's belief that he was harassed at the prison may have been rational and based on fact, not paranoia.

**15.** The three evaluators each met with Arguelles individually. Dr. Gardner spent ninety minutes with Arguelles, Dr. Kovnick five hours, and Dr. Bigler ninety minutes.

overwhelming, that we are compelled to question the conclusions of trained experts and the superior vantage point of the trial court.

¶ 60 Next, the court assistant claims that the evaluators focused on the wrong criteria in considering competency and overlooked factors suggesting incompetency. The assistant claims that the evaluators investigated three questions: whether Arguelles was competent to waive his appeal and proceed to execution, whether he was capable of understanding his decision to represent himself, and whether he suffered brain damage from the attempted hanging. These three questions, the assistant asserts, were not the proper inquiry for the evaluators; rather, they should have considered whether Arguelles was competent to participate in his appeal.

¶ 61 To decide whether a person is competent to stand trial or assist in his appeal, the court must determine whether the person has a mental disorder that results in "(1) his inability to have a rational and factual understanding of the proceedings against him or of the punishment specified for the offense charged; or (2) his inability to consult with his counsel and to participate in the proceedings against him with a reasonable degree of rational understanding." Utah Code Ann. § 77–15–2 (2002). By contrast, to decide whether a person is competent to waive the right to appeal, the court must determine "whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises."

*Rees v. Peyton*, 384 U.S. 312, 314, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966).

¶ 62 The court assistant fails to identify how the questions the evaluators focused upon were inadequate to the task of determining Arguelles's competence to participate in his appeal. Surely, in determining that Arguelles was competent to waive his appeal and proceed to execution, that he was capable of understanding his decision to represent himself, and that he had suffered no significant brain damage from the attempted hanging, the evaluators could also conclude that Arguelles was competent to participate in his appeal. The ultimate conclusion of the evaluators—that Arguelles had a "sufficient present ability to consult with his attorney with a reasonable degree of rational understanding and rational as well as factual understanding of the proceedings against him"—is precisely the test for competence to assist in one's own appeal.

¶ 63 Further, we cannot see how Arguelles's competence to participate in his appeal was placed in question. Arguelles repeatedly stated, both before and after the hanging, that he wished to forego his right to appeal and move directly to imposition of his sentence. Since capital appeals are mandated by statute, Arguelles could not forego the appeal but could only waive his involvement in the appeal. The question at issue, therefore, was whether Arguelles continued to be competent to waive his right to participate in his appeal—the very issue the evaluators addressed.

¶ 64 The court assistant also complains that the evaluators failed to address all of the criteria set forth in Utah Code section 77–15–5.[16] The court assistant does not identify,

16. The statute requires competency experts to consider and address the following factors:
 (a) the defendant's present capacity to:
 (i) comprehend and appreciate the charges or allegations against him;
 (ii) disclose to counsel pertinent facts, events, and states of mind;
 (iii) comprehend and appreciate the range and nature of possible penalties, if applicable, that may be imposed in the proceedings against him;
 (iv) engage in reasoned choice of legal strategies and options;
 (v) understand the adversary nature of the proceedings against him;
 (vi) manifest appropriate courtroom behavior; and
 (vii) testify relevantly, if applicable;
 (b) the impact of the mental disorder, or mental retardation, if any, on the nature and quality of the defendant's relationship with counsel;
 (c) if psychoactive medication is currently being administered:
 (i) whether the medication is necessary to maintain the defendant's competency; and

however, which criteria the evaluators overlooked or how Arguelles was prejudiced. In *State v. Lafferty*, 2001 UT 19, ¶¶ 40–42, 20 P.3d 342, we held that it was harmless error where the written competency reports did not specifically address all of the factors listed in section 77–15–5 but all the relevant factors were addressed through the reports and subsequent hearing. Such is the case here. Although the written reports do not use the precise language of the statute or organize their analysis by the statutory factors, the reports, in combination with the testimony offered at the competency hearing, specifically address Arguelles's abilities in such a way that all the relevant statutory factors are considered. The fact that the reports do not address the effects of "psychoactive medication" on Arguelles is of no consequence since Arguelles was not on such medication.

¶ 65 Finally, the court assistant states that the evaluators overlooked Arguelles's complaints that someone had tampered with his cell and "the coercive effects" that being on death row has upon an inmate. The record reveals, however, that the evaluators considered Arguelles's complaints of tampering. While in prison, Arguelles complained that there were toxic fumes in his cell and that someone had placed substances in his shampoo and toothpaste. The record suggests there may have been a factual basis for these concerns. However, even if Arguelles's concerns had no basis in reality, one of the evaluators stated that such notions would not rise to the level of delusions that would affect Arguelles's competency. It is quite apparent, therefore, that the evaluators did not overlook this issue.

¶ 66 The court assistant argues that the evaluators failed to take into consideration the "coercive effects" of death row on Arguelles. The assistant suggests that Arguelles's desire to not participate in his appeal is merely the result of the uncomfortable environment of the prison. As the assistant notes, a number of commentators have suggested that being on death row has deleteri-

ous effects on the human psyche. The court assistant fails to explain, however, what effect death row had upon Arguelles. Arguelles made clear his intent to seek the death penalty long before he was placed on death row, and, indeed, before he had even pled guilty. When asked, Arguelles insisted that his environment on death row had not affected his desire to seek the death penalty. Given this statement and the lack of any evidence to the contrary, we see no cause to presume Arguelles had been rendered incompetent by his stay on death row or that he was incapable of waiving involvement in his appeal.

## 2. Findings of Fact Concerning Competency

 ¶ 67 Next, the court assistant claims that the trial court's findings of fact concerning competency are "replete with legal errors." To challenge the factual findings of the trial court, the court assistant must "first marshal all record evidence that supports the challenged finding[s]." Utah R.App. P. 24(a)(9). "A trial court's factual findings will not be overturned unless they are clearly erroneous." *State v. Lafferty*, 2001 UT 19, ¶ 45, 20 P.3d 342. In addition, since this claim was not preserved, the court assistant must show that there was an error in the findings, that the error was obvious, and that it was prejudicial.

¶ 68 The court assistant identifies a number of factors he feels the trial court failed to consider in making its factual findings. The assistant, however, fails to marshal the evidence supporting the findings he attacks. Instead, he avoids addressing the weight of evidence supporting the court's findings by prefacing his analysis with an admission that "there is evidence to marshal in support" of the trial court's findings. Acknowledging the existence of evidence to marshal is a far cry from actually marshaling the evidence. *See State v. Woodland*, 945 P.2d 665, 668 (Utah 1997) ("[Defendant] must marshal the evidence in a light most favorable to the findings of the trial court and show that evidence

(ii) the effect of the medication, if any, on the defendant's demeanor and affect and ability to participate in the proceedings.

Utah Code Ann. § 77–15–5(4) (2001).

to be insufficient."). Having reviewed the record with regard to the court assistant's claims, we determine that the factual findings of the trial court are not "replete with legal errors," and by no means are against the great weight of the evidence. Rather, the findings contain only a few slight misstatements that cannot be presumed prejudicial. Reversal of the trial court's finding of competency therefore is not in order.

## II. WAIVER OF RIGHT TO COUNSEL

¶ 69 The court assistant argues that the lower courts erred in permitting Arguelles to represent himself during the penalty phase of the trial. The court assistant makes three arguments to support this claim. First, he argues that Arguelles's waiver of the right to counsel was not voluntary. The court assistant asserts that Arguelles was given a constitutionally improper choice to accept new counsel or proceed pro se, and that the imposition of this choice undermined the reliability of Arguelles's waiver. Second, the assistant argues that Arguelles was not competent to waive the right to counsel. Given Arguelles's history of mental illness and his open desire to seek the death penalty, the court assistant claims, Arguelles was not competent to knowingly and voluntarily waive this right. Finally, the court assistant argues that the waiver of counsel undermined the integrity of the proceedings. The court assistant argues that, because defendant sought the death penalty, the mitigating evidence presented by Arguelles was merely a "sham," which impaired the functioning of the adversarial system.

¶ 70 We have held that before a defendant can waive the right to counsel, "the defendant 'should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.'" *State v. Frampton*, 737 P.2d 183, 187 (Utah 1987) (quoting *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)(internal quotation omitted)). The preferred method of establishing the validity of a waiver is a colloquy on the record between the court and the defendant. *Id.* In this colloquy, the court should do the following:

(1) advise the defendant of his constitutional right to the assistance of counsel, as well as his constitutional right to represent himself; (2) ascertain that the defendant possesses the intelligence and capacity to understand and appreciate the consequences of the decision to represent himself, including the expectation that the defendant will comply with technical rules and the recognition that presenting a defense is not just a matter of telling one's story; and (3) ascertain that the defendant comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case.

*State v. Heaton*, 958 P.2d 911, 918 (Utah 1998); *see also State v. Petty*, 2001 UT App 396, ¶ 6, 38 P.3d 998. In the absence of such a colloquy, we will review the record de novo to determine the validity of the waiver. *Heaton*, 958 P.2d at 918. In our review, we indulge every reasonable presumption against waiver of the right. *Id.* at 917.

¶ 71 On two separate occasions the lower courts engaged Arguelles in a colloquy concerning self-representation. During both colloquies, Arguelles was informed of his right to counsel and to represent himself. Through the course of the colloquies, the courts had ample opportunity to determine that Arguelles had the intelligence and capacity to understand the consequences of proceeding without counsel. Arguelles repeatedly affirmed that he was capable of understanding the proceedings, was competent, and was knowingly and voluntarily waiving the right to counsel; and standby counsel affirmed that Arguelles was fully capable of understanding what it meant to waive counsel. Finally, during the hearing Arguelles manifested a clear understanding of the charges against him and the potential penalties. He responded knowingly as the charges were explained to him and presented an understanding that his punishment could be substantial prison time or execution.

## A. Voluntariness of Waiver

■ ¶ 72 Despite this extensive colloquy, the court assistant argues that Arguelles's waiver was not voluntary because Arguelles was required to choose between accepting new counsel and proceeding pro se. After determining that Arguelles's counsel had a conflict of interest in the case and should be disqualified, the court offered to appoint new counsel for the defendant. When Arguelles refused this offer, the court informed him that he would either need to accept new counsel or represent himself. Arguelles decided to represent himself.

■ ¶ 73 It is true that "[a] defendant's assertion of the right of self-representation must be voluntary, the product of a free and meaningful choice." *State v. Bakalov*, 1999 UT 45, ¶ 16, 979 P.2d 799; *see also McKee v. Harris*, 649 F.2d 927, 931 (2d Cir. 1981). However, we have held that requiring a defendant to choose between competent appointed counsel and proceeding pro se does not amount to an involuntary decision. *Bakalov*, 1999 UT 45 at ¶ 20, 979 P.2d 799; *see also Barratt v. Garvin*, 2000 U.S. Dist. LEXIS 13587, *13, 2000 WL 1364352, *5 (S.D.N.Y. Sept. 21, 2000); *State v. Vancleave*, 2001 UT App 228, ¶ 16, 29 P.3d 680. A court may, "under certain circumstances, require the defendant to select from a limited set of options a course of conduct regarding his representation." *McKee*, 649 F.2d at 931.

■ ¶ 74 Where, as here, the defendant "expressly declined an offer of counsel by the trial judge, he has the burden of showing by a preponderance of the evidence that he did not so waive [his right to counsel]." *Frampton*, 737 P.2d at 187 (citing *Moore v. Michigan*, 355 U.S. 155, 161–62, 78 S.Ct. 191, 2 L.Ed.2d 167 (1957)). The defendant may meet this burden by showing that the counsel offered him was incompetent or otherwise inadequate to the task of representing him. After all, "[a] defendant cannot be forced to proceed with incompetent counsel ... '[a] choice between proceeding with incompetent counsel or no counsel is in essence no choice at all.'" *Bakalov*, 1999 UT

45 at ¶ 20, 979 P.2d 799 (quoting *Wilks v. Israel*, 627 F.2d 32, 36 (7th Cir.1980)).

■ ¶ 75 In this case, the court assistant does not argue that the new counsel assigned Arguelles was in any way incompetent; he merely asserts that Arguelles had developed a relationship of trust with his original counsel and was improperly denied the option of proceeding with the counsel he preferred. "That petitioner did not particularly like the choice presented to him and that he did not want to proceed pro se are not sufficient reasons to render the choice constitutionally offensive." *Wilks*, 627 F.2d at 36. A defendant is "not entitled to pick and choose" among court-appointed counsel. *Bakalov*, 1999 UT 45 at ¶ 20, 979 P.2d 799 (quoting *State v. Wulffenstein*, 733 P.2d 120, 121 (Utah 1986)). Absent some compelling reason why the representation offered Arguelles was inadequate, we will not conclude that the choice presented him denied him the right to counsel. *See Wilks*, 627 F.2d at 36; *Vancleave*, 2001 UT App 228 at ¶¶ 15–16 & n. 5, 29 P.3d 680.

## B. Competency to Waive Right to Counsel

¶ 76 Next, the court assistant asserts that even if the waiver was voluntary, the waiver was ineffective because Arguelles was not competent to waive the right to counsel. By asserting that Arguelles was incompetent to waive counsel, the court assistant attempts to minimize the import of the clarity manifested by Arguelles during the two colloquies regarding self representation. We cannot, however, consider the question of Arguelles's competency without considering the quality of his responses on the record.

¶ 77 The U.S. Supreme Court has held that the minimum requirements for competency to waive assistance of counsel are no greater than the requirements for competency to stand trial. *See Godinez v. Moran*, 509 U.S. 389, 399, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993).[17] Some states have established additional requirements for competency to waive counsel, *see, e.g., People v. Lego*, 168 Ill.2d 561, 214 Ill.Dec. 264, 660 N.E.2d 971, 973,

---

**17.** The Court did, however, note that states are "free to adopt competency standards that are

more elaborate ...." *Godinez*, 509 U.S. at 402, 113 S.Ct. 2680.

978–79 (1995); *State v. Klessig,* 211 Wis.2d 194, 564 N.W.2d 716, 724 (1997); *Commonwealth v. Simpson,* 44 Mass.App.Ct. 154, 689 N.E.2d 824, 831 (1998), while others have maintained that competency to waive counsel requires no more than competency to stand trial. *See, e.g., State v. Camacho,* 561 N.W.2d 160, 171–72 (Minn.1997); *Commonwealth v. Starr,* 541 Pa. 564, 664 A.2d 1326, 1336 (1995); *People v. Wilder,* 35 Cal.App.4th 489, 41 Cal.Rptr.2d 463, 466–67 (1995).

¶ 78 In this case, the record gives no reason to presume Arguelles was not competent to stand trial, *see* section I A, *supra,* and indeed, shows that Arguelles expressed a high degree of coherence and intelligence during the colloquies and other proceedings. We therefore see no reason to presume that he was not competent to waive counsel. Standing alone, a defendant's past history of mental illness and preference for the death penalty over life imprisonment do not establish an incapacity to knowingly and voluntarily choose to forego counsel. To hold that a defendant with any history of mental illness or a desire for the death penalty is presumptively incompetent to control his own defense would significantly burden the accused's constitutional right to represent himself.

¶ 79 Finally, the trial court in this case justifiably relied on the position taken by the defendant and his then counsel. Not only did defendant fail to raise a question about his competency, he affirmatively stated that he was competent to represent himself—and his counsel agreed. The court assistant has given us no reason, aside from observations about capital defendants in general and about Arguelles's mental health history, to disregard the statements on the record concerning competence. We therefore see no cause to question the adequacy of the trial court's ruling, based as it was on its superior fact-finding perspective, that Arguelles was competent to waive counsel.

18. The court assistant has not identified any specific mitigating evidence that could have been submitted but was not, nor has he explained how such evidence outweighed the aggravating factors. We have stated that "we will not set aside a verdict because of the erroneous exclusion of evidence unless a proffer of evidence appears [in

### C. *Mitigating Evidence*

[27] ¶ 80 Finally, the court assistant argues that the presentation of mitigating evidence by Arguelles was merely a "sham," creating a breakdown in the adversarial system that necessarily draws into question the reliability of the death verdict. The assistant contends that the trial court should have employed independent counsel to present additional mitigating evidence Arguelles failed to bring forward.[18]

¶ 81 The assistant's position is not entirely without precedent. The United States Supreme Court has held that capital punishment statutes must provide certain procedural safeguards, including the consideration of aggravating and mitigating circumstances, to ensure that the death penalty is not imposed arbitrarily or capriciously. *See Johnson v. Texas,* 509 U.S. 350, 359–62, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993). Thus, the Court has determined that in order for a death penalty to be constitutionally permissible, "the capital defendant generally must *be allowed* to introduce any relevant mitigating evidence regarding his 'character or record and any of the circumstances of the offense.' " *California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (quoting *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (citations omitted)) (emphasis added).

¶ 82 The United States Supreme Court, however, has never ruled upon whether a defendant may waive his right to the presentation of mitigating evidence. Some courts have held that in capital cases the Eighth Amendment requires admission of all available mitigating evidence to ensure the reliability of the death verdict, regardless of whether the defendant approves of having such evidence presented. *See State v. Koedatich,* 112 N.J. 225, 548 A.2d 939, 992–97 (1988); *see also Morrison v. State,* 258 Ga. 683, 373 S.E.2d 506, 509 (1988) (stating that

the] record." *State v. Telford,* 940 P.2d 522, 526 (Utah Ct.App.1997) (quoting *State v. Rammel,* 721 P.2d 498, 499 (Utah 1986)). The court assistant has made no such proffer, and we decline to speculate upon what additional mitigating evidence might have been offered.

where defendant refuses to offer mitigating evidence, the trial court "may" have an obligation to conduct an independent investigation into evidence of mitigation). The vast majority of courts considering this issue, however, have reached the opposite conclusion, determining that a defendant's Sixth Amendment right to represent himself and control the course of the proceedings carries with it the right to choose how much—if any—mitigating evidence is offered. *See, e.g., United States v. Davis,* 285 F.3d 378, 381–85 (5th Cir.2002) (overturning district court's decision to appoint independent counsel to present mitigating evidence defendant refused to present); *Singleton v. Lockhart,* 962 F.2d 1315, 1322 (8th Cir.1992) (finding no ineffective assistance of counsel where counsel complied with client's demand to present no mitigating evidence); *Silagy v. Peters,* 905 F.2d 986, 1008 (7th Cir.1990) (stating a capital defendant may forego the presentation of mitigating evidence); *Nelson v. State,* 681 So.2d 252, 255–56 (Ala.Crim.App.1995) (stating capital defendant may waive the presentation of mitigating evidence); *People v. Bloom,* 48 Cal.3d 1194, 259 Cal.Rptr. 669, 774 P.2d 698, 718–19 (1989) (upholding death verdict where self-represented defendant chose to present no mitigating evidence); *Hamblen v. State,* 527 So.2d 800, 804 (Fla.1988) (upholding death verdict where self-represented defendant did not oppose death verdict and chose to present no mitigating evidence); *State v. Coleman,* 168 Ill.2d 509, 214 Ill.Dec. 212, 660 N.E.2d 919, 933 (1995) (upholding death verdict where self-represented defendant chose to present no mitigating evidence); *State v. Ashworth,* 85 Ohio St.3d 56, 706 N.E.2d 1231, 1236–39 (1999) (upholding death verdict where defendant chose to present no mitigating evidence); *Wallace v. State,* 893 P.2d 504, 511–12 (Okla.Crim.App. 1995) (upholding death verdict where defendant openly sought death penalty and chose to present no mitigating evidence); *Zagorski v. State,* 983 S.W.2d 654, 657–59 (Tenn.1998) (finding no ineffective assistance of counsel

where counsel complied with client's demand to present no mitigating evidence). We agree with the reasoning of these courts.

¶ 83 Although the United States Supreme Court has never decided whether a defendant may waive the presentation of mitigating evidence, its opinions suggest that such a right naturally extends from the Sixth Amendment. The Court has emphasized that the right to represent oneself is at the very core of the Sixth Amendment. *Faretta v. California,* 422 U.S. 806, 832, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The right to counsel, the Court has said, is a personal right and may be waived by the defendant. *Id.* at 834, 95 S.Ct. 2525. Further, the Court has determined that a capital defendant may waive the right to appeal, *Gilmore v. Utah,* 429 U.S. 1012, 1015, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976), and that a self-representing defendant must be allowed to control the course of the proceedings.[19] *McKaskle v. Wiggins,* 465 U.S. 168, 179–81, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). Given the importance of the right to represent oneself and direct the proceedings, we are loathe to take a stance that would run directly contrary to this right. We agree with the statement of the Fifth Circuit Court of Appeals:

> An individual's constitutional right to represent himself is one of great weight and considerable importance in our criminal justice system. This right certainly outweighs an individual judge's limited discretion to appoint amicus counsel when that appointment will yield a presentation to the jury that directly contradicts the approach undertaken by the defendant.

*Davis,* 285 F.3d at 381.

¶ 84 As other courts have recognized, a rule requiring the court to appoint counsel to present evidence against defendant's wishes would not only undermine the defendant's Sixth Amendment rights, it would be largely unenforceable. "A rule requiring a pro se defendant to present mitigating evidence

---

19. When considering the role of mitigating evidence in capital cases, the Court has phrased the presentation of mitigating evidence as a permissive right. *See, e.g., California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) ("[T]he capital defendant generally must

be allowed to introduce any relevant mitigating evidence ...." (emphasis added)); *see also Wallace,* 893 P.2d at 510 n. 4 (quoting language of United States Supreme Court cases dealing with mitigating evidence).

would be unenforceable, as the court has no means to compel a defendant to put on an affirmative defense." *Bloom,* 259 Cal.Rptr. 669, 774 P.2d at 718. In this case, "even if the judge had appointed counsel to argue for mitigation, there is no power that could have compelled [the defendant] to cooperate and divulge such information." *Hamblen,* 527 So.2d at 804.

 ¶ 85 Finally, we are not convinced that defendant's failure to offer all possible mitigating evidence undermined the reliability of the verdict. Even where a defendant seeks the death penalty, the death verdict will not stand without conformity with the procedural safeguards provided in our death penalty statutes. First, the death penalty is not available unless the defendant has pled guilty to or been found guilty of committing a capital crime. Utah Code Ann. § 76–3–207(1) (2001). Before accepting Arguelles's plea, the judge questioned Arguelles to make certain defendant understood the charges against him, knew the consequences of pleading guilty, and made the plea knowingly and voluntarily. Second, the sentencer may not impose the death penalty unless it finds beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstance *and* that imposition of the death penalty is "justified and appropriate" under the circumstances. Utah Code Ann. § 76–3–207(4)(b); *State v. Holland,* 777 P.2d 1019, 1026 (Utah 1989). In this case, Arguelles did not refuse to present any mitigating evidence, but merely limited the amount of such evidence. The judge imposed the death verdict only after finding that the State had met its burden of showing the death penalty was appropriate for this person and these crimes. Third, the sentence must withstand mandatory appellate review. Utah Code Ann. § 76–3–207(5). We uphold Arguelles's sentence only after carefully considering the record to determine whether the sentence was imposed lawfully. *See State v. Wood,* 648 P.2d 71 (Utah 1982) *and* discussion *infra* at section VIII. Given these procedural safeguards, the importance of defendant's right to waive counsel and control his defense, and the impracticality of requiring the presentation of all mitigating evidence, we hold that Arguelles's sentence is sound regardless of his failure to offer additional mitigating evidence.

## III. DISQUALIFICATION OF DEFENSE COUNSEL

¶ 86 The court assistant claims that the trial court erred in removing Arguelles's original appointed counsel with whom Arguelles had apparently established a relationship of trust. He argues that the removal deprived Arguelles of his Sixth Amendment right to counsel of choice [20] and that the death sentence should therefore be reversed. We have already determined that Arguelles's waiver of the right to counsel was not rendered involuntary by the choice to either accept new counsel or proceed pro se, *see* section II A, *supra.* We therefore consider here whether (1) the trial court erred in determining that the LDA was disqualified, (2) the trial court properly determined that Arguelles could not waive his right to conflict-free counsel, and (3) whether any error in disqualifying the LDA was prejudicial to defendant.

 ¶ 87 "The accused, although guaranteed the right to counsel by the Sixth Amendment, does not have the absolute right to counsel of his or her own choosing." *United States v. Okun,* 2001 U.S.App. LEXIS 14193, *5, 12 Fed. Appx. 83, 85, 2001 WL 699099, *2 (2d Cir. June 20, 2001). The Sixth Amendment entails a limited right to select and be represented by an attorney of one's choosing; however, "the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) ("the sixth amendment provides that

20. The court assistant also asserts that we should overturn Arguelles's sentence based upon article I, sections 7 and 12 of the Utah Constitution and section 77–1–6 of the Utah Code. The court assistant, however, provides no analysis of these provisions or how they relate to the disqualification of the LDA. We decline to address these claims because they have not been adequately briefed. *See State v. Lafferty,* 749 P.2d 1239, 1247 n. 5 (1988).

criminal defendants who can afford retained counsel have a qualified right to counsel of their choice"). Thus, when considering Sixth Amendment claims, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." *United States v. Cronic,* 466 U.S. 648, 657 n. 21, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *see also Morris v. Slappy,* 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) (holding that there is no Sixth Amendment right to "a meaningful attorney-client relationship").

¶ 88 We review the trial court's decision to disqualify the LDA for an abuse of discretion. *See United States v. Lanoue,* 137 F.3d 656, 664 (1st Cir.1998); *United States v. Locascio,* 6 F.3d 924, 931 (2d Cir. 1993). The trial court must be given substantial deference in making its determination whether to disqualify counsel because "[t]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials." *Wheat,* 486 U.S. at 162–63, 108 S.Ct. 1692.[21] In determining whether to disqualify counsel, the trial court must recognize a presumption in favor of defendant's counsel of choice. *Id.* at 164, 108 S.Ct. 1692. This presumption may be overcome by a demonstration of an actual conflict or by a showing of a serious potential conflict. *Id.*

¶ 89 If a conflict is found, a defendant has a limited right to waive his or her right to conflict-free counsel. *Id.* at 161–62, 108 S.Ct. 1692. The trial court, however, must be given "substantial latitude" to refuse the proffered waiver and to disqualify counsel in opposition to defendant's wishes. *Id.* at 163, 108 S.Ct. 1692. The right to waive conflict-free counsel is circumscribed because the court has "an independent interest in

ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."[22] *Id.* at 160, 108 S.Ct. 1692.

¶ 90 In this case, the trial court disqualified the LDA because Johnson, an LDA investigator, was previously employed by the Salt Lake County Sheriff's Office and had investigated an earlier case in which Arguelles was convicted of attempted murder and aggravated assault. The trial court noted that the testimony of Johnson was relevant and admissible in this case, that it was adverse to defendant, and that the parties had no other adequate source for this information.

¶ 91 The court assistant claims that the State had no true intent to call Johnson as a witness but merely professed such an intent in an effort to have the LDA disqualified and to deny Arguelles his counsel of choice. The court assistant correctly notes that adverse counsel should not be called as a witness to offer insignificant testimony or as a ruse to disqualify counsel. *See, e.g., State v. Worthen,* 765 P.2d 839, 849 (Utah 1988). We are not convinced, however, that Johnson's testimony was insignificant or that the motion to disqualify him was merely a pretext. Johnson had specific knowledge of Arguelles's prior offenses. His testimony was relevant to the nature and extent of Arguelles's criminal past, which would be considered an aggravating factor at sentencing. Johnson's identification as a witness for the prosecution thus posed a serious potential conflict.

¶ 92 We are also not convinced that the State had an improper motive in moving to disqualify the LDA. Notwithstanding the court assistant's general claim of impropriety, there is no evidence, nor any reason to

---

**21.** In *Wheat,* the conflict was the result of a single attorney representing more than one defendant. Although the potential conflict in this case does not involve multiple defendants, *Wheat* is controlling in cases such as this where there is an actual or serious potential conflict. *See generally State v. Johnson,* 823 P.2d 484 (Utah Ct.App. 1991) (applying *Wheat* analysis to conflict between counsel and client).

**22.** The United States Supreme Court has also noted that, in making this determination, trial courts are at risk of being "whipsawed" by claims of error on appeal no matter which way they rule. *Wheat,* 486 U.S. at 161, 108 S.Ct. 1692. If the trial court allows the waiver, the defendant might later claim ineffective assistance of counsel. *Id.* at 161–62, 108 S.Ct. 1692. On the other hand, if the court refuses the waiver, the defendant might, as here, claim he was denied counsel of choice. *Id.*

presume, that the State's motive was to deny Arguelles his right to counsel. First, the State moved to disqualify the LDA before it was made aware that Arguelles would refuse new counsel if the LDA were disqualified. Second, the State had no real reason to oppose the LDA, since the LDA attorneys had agreed to assist Arguelles in his desire to receive the sentence promoted by the State, i.e., a death sentence. Given the potential value of Johnson's testimony and the absence of evidence that the State acted with improper motive, we hold that the trial court did not abuse its discretion in disqualifying the LDA.

¶ 93 The trial court did err, however, in rejecting outright Arguelles's waiver of the right to conflict-free counsel. When Arguelles responded that he was willing to waive any conflict, the trial court stated that Arguelles could not waive the right to effective assistance of counsel. A defendant does, however, have a limited right to waive conflict-free counsel. *Wheat*, 486 U.S. at 161–62, 108 S.Ct. 1692; *see also State v. Johnson*, 823 P.2d 484, 490 (Utah Ct.App.1991). Upon finding a serious potential conflict that defendant was willing to waive, the trial court should have weighed the defendant's right to counsel of choice against the seriousness of the potential conflict. *Wheat*, 486 U.S. at 163–64, 108 S.Ct. 1692; *Johnson*, 823 P.2d at 488 (citing *United States v. Collins*, 920 F.2d 619, 626 (10th Cir.1990)). On the face of the record, it appears the trial court rejected the waiver without balancing the interests at stake.

¶ 94 Upon finding error, we need not reverse the sentence if we find the error to be harmless beyond a reasonable doubt.[23] *State v. Honie*, 2002 UT 4, ¶ 54, 57 P.3d 977 (quoting *State v. Lafferty*, 2001 UT 19, ¶ 35, 20 P.3d 342). "An error is harmful if it undermines our confidence in the verdict; if, minus the error, there is a sufficiently high likelihood of a different outcome." *Lafferty*, 2001 UT 19 at ¶ 35, 20 P.3d 342. The burden of showing such a likelihood rests on the complaining party. *Honie*, 2002 UT 4 at ¶ 54, 57 P.3d 977.

¶ 95 In this case, even if we presume that the court improperly rejected Arguelles's waiver of conflict-free counsel, we are not convinced that the error prejudiced defendant. First, Arguelles was not denied competent counsel. After the LDA was disqualified, Arguelles was offered counsel, which he voluntarily declined, *see* section II A, *supra*. Second, we are not persuaded that a different outcome would have resulted if the LDA were not disqualified. Arguelles was adamant about seeking the death penalty from the start, and, no matter who represented him, it is quite unlikely that he would have allowed any counsel to mount a significant defense to the death sentence or that such a defense would have been successful, given the horrific nature of Arguelles's crimes and the paucity of mitigating circumstances. We therefore hold that the error in failing to consider Arguelles's waiver of conflict-free counsel was harmless beyond a reasonable doubt.

## IV. PRESS PHOTOGRAPHY

¶ 96 The court assistant argues that the trial court committed structural error by permitting the press to take photographs during the penalty phase hearings. He argues that this compromised Arguelles's Sixth Amendment right to represent himself since it may have influenced Arguelles's choice to seek the death penalty and not prepare a "meaningful" mitigation case. The court assistant also argues that allowing the photography violated the Eighth Amendment because the "distraction of the photographer drove Arguelles to shorten the proceedings and reject a meaningful mitigation case." The State ar-

---

23. The court assistant argues that we should treat each of his claims of error as a structural error and reverse the sentence with no harmless error analysis. With few exceptions, constitutional errors are reviewed for harmlessness. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Structural error is reserved for a "very limited class of cases" in which a constitutional error so undermines the fairness of the proceedings that prejudice must be presumed. *Johnson v. United States*, 520 U.S. 461, 468–69, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). We find no merit in the court assistant's argument that we treat all errors as presumptively prejudicial, and we decline to adopt such a rule.

gues that the record shows no obvious and prejudicial Sixth Amendment violation, and that Arguelles had already decided to not oppose the death penalty prior to the penalty phase.

■ ¶ 97 The United States Supreme Court has stated that while the First and Sixth Amendments guarantee the right of the press to attend a trial and report on what they have observed, the Fourteenth Amendment Due Process Clause assures each defendant the fundamental right to a fair trial. *Chandler v. Florida*, 449 U.S. 560, 569, 571, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981). There is no per se prohibition or allowance of electronic media coverage during judicial proceedings. *Id.* at 569, 101 S.Ct. 802. However, "a defendant might show that broadcast coverage of his particular case had an adverse impact on the trial participants sufficient to constitute a denial of due process." *Id.* at 581, 101 S.Ct. 802.

■ ¶ 98 This court has stated that the media has a right of access to criminal proceedings, but this right is not absolute and is subject to exceptions. *State v. Archuleta*, 857 P.2d 234, 237 (1993); *Kearns–Tribune Corp. v. Lewis*, 685 P.2d 515, 522 (1984). The right of access "must be weighed against other considerations, including the accused's Sixth Amendment right to a fair trial." *Archuleta*, 857 P.2d at 237. A court may restrict "access altogether where necessary to assure that the defendant receives a fair trial . . . ." *Kearns–Tribune*, 685 P.2d at 522.

¶ 99 Utah courts have discretion to allow still photography in the courtroom. Utah R. Judicial Admin. 4–401(4). In determining whether to allow still photography during a hearing, a judge "should consider whether . . . photography can be accommodated without distracting the participants . . . [and whether] there is a substantial likelihood photography would jeopardize the right to a fair hearing or trial . . . ." *Id.* at 4–401(4)(A)(B). The court should forbid photography if it distracts by appearance or noise, or if it would "create a distraction from the proceedings for any of the participants . . . ." *In Re Modification of Canon 3A(7)*, 628 P.2d 1292, 1294 (Utah 1981).

¶ 100 In Arguelles's motion to prohibit photography, he indicated that photography would be "very distracting and irritating" and would infringe upon his ability to represent himself. He also stated that he would refuse to appear if photography were allowed. After the trial court denied the motion, Arguelles threatened to leave the courtroom, but the court ordered him to stay. A short time later during the hearing, after standby counsel argued a motion to exclude victim impact evidence, standby counsel told the court that Arguelles had "missed at least 50 percent of what we each had to say . . . ." The court acknowledged that the photography was "modestly" distracting. On the second day of the penalty phase hearing, while cross-examining a witness, Arguelles asked the cameraman to "knock that off, please." The trial court asked the cameraman to stop, but lifted the prohibition after the witness stepped down.

■ ¶ 101 Arguelles's motion was made prior to the penalty phase, and he complained about the photography during the penalty phase hearing. Therefore, his objection was properly preserved. Because it is within the trial court's discretion under Utah R. Judicial Admin. 4–401(4) to allow still photography during hearings, we use an abuse of discretion standard of review. "A trial judge is given a great deal of latitude in determining the most fair and efficient manner to conduct court business." *Morton v. Continental Baking Co.*, 938 P.2d 271, 275 (Utah 1997). We will find that a trial court has abused its discretion "only if the trial court's decision was 'beyond the limits of reasonability.'" *State v. Olsen*, 860 P.2d 332, 334 (Utah 1993) (quoting *State v. Hamilton*, 827 P.2d 232, 239–40 (Utah 1992)). An abuse of discretion occurs if the trial court's actions are "inherently unfair" or "if we conclude that 'no reasonable [person] would take the view adopted by the trial court.'" *State v. Russell*, 791 P.2d 188, 192 (Utah 1990); *State v. Schweitzer*, 943 P.2d 649, 651 (Utah Ct. App.1997) (quoting *State v. Gerrard*, 584 P.2d 885, 887 (Utah 1978)).

■ ¶ 102 We need not consider whether the trial court abused its discretion since we

find that the press photography was not prejudicial. We are not convinced that Arguelles would have rejected the death penalty or presented a "meaningful" mitigation case had there not been photography during the penalty phase hearing. In fact, one month prior to filing the motion to prohibit photography, Arguelles had commented to the trial court that he would present "very little, if any" mitigation evidence. Further, Arguelles indicated as early as his confession to the crimes that he wished to seek the death penalty. We therefore find no Eighth Amendment violation and hold that any Sixth Amendment error in allowing still photography during the penalty phase hearing was harmless. We do encourage trial judges, however, to continue to exercise caution in maintaining quiet and non-distracting courtroom environments in all cases, and particularly in capital proceedings.

## V. MITIGATING AND AGGRAVATING FACTORS

¶ 103 The court assistant claims the trial court erred in the manner in which it evaluated and weighed evidence of aggravating factors presented during sentencing.[24] We review the court assistant's contentions for plain error, determining whether improper factors were considered and, if so, whether they were prejudicial.

¶ 104 The Utah Code states that "[w]hen a defendant has pled guilty to or been found guilty of a capital felony, there shall be further proceedings before the court or jury on the issue of sentence." Utah Code Ann. § 76–3–207(1)(a) (Supp.2001). During this proceeding, aggravating and mitigating factors are weighed. "The death penalty shall only be imposed if, after considering the totality of the aggravating and mitigating circumstances, the jury is persuaded . . . that total aggravation outweighs total mitigation, and is further persuaded, beyond a reasonable doubt, that the imposition of the death penalty is justified." Utah Code Ann. § 76–3–207(4)(b). On appeal, we will not automatically set aside a death sentence if one aggra-

vating factor is invalid. *Zant v. Stephens,* 462 U.S. 862, 890, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Under the *Wood* analysis, an invalid factor will simply be removed from the calculus, and if aggravating factors still outweigh mitigating factors beyond a reasonable doubt, the death sentence will be upheld. *State v. Honie,* 2002 UT 4, ¶ 64, 57 P.3d 977 (citing *State v. Wood,* 648 P.2d 71, 83 (Utah 1982).)

¶ 105 Aggravating and mitigating factors are primarily concerned with "the nature and circumstances of the crime" and "the defendant's character, background [or] history." Utah Code Ann. § 76–3–207(2)(a)(i–ii). Additionally, the Code states that in capital sentencing proceedings "any other facts in aggravation or mitigation of the penalty that the court considers relevant to the sentence" may be examined. Utah Code Ann. § 76–3–207(2)(a)(iv). These aggravating and mitigating factors "need not have been admitted into evidence or proven beyond a reasonable doubt during the guilt phase." *State v. Honie,* 2002 UT 4, ¶ 59, 57 P.3d 977. The examples of aggravating and mitigating factors in Utah Code sections 76–3–207(3) and 76–5–202(1), are not intended to be exhaustive or to create a limitation on what may be presented during the sentencing hearing. *Honie,* 2002 UT 4 at ¶ 60, 57 P.3d 977.

### A. Opting Out of Life Without Parole

¶ 106 During sentencing, Arguelles opted to remove life without possibility of parole as a sentencing option, leaving death or life with the possibility of parole as the two sentencing options. The trial court thus felt the need to examine the possibility of Arguelles's future criminal behavior. According to the court assistant, Arguelles was punished by the court for exercising his right to limit his sentencing options. He argues that Arguelles should not be punished for opting to use his statutory right to waive the sentencing option of life without the possibility of parole. The State argues that the court

---

**24.** The court assistant also argues that because Arguelles was "suicidal and incompetent," the limited mitigating evidence presented under-

mined the reliability of the sentence. *See* section II C, *supra.*

assistant has failed to show that Arguelles was in fact prejudiced.

¶ 107 The trial court did not cite Arguelles's decision to opt out of life without the possibility of parole as an aggravating factor. The trial court stated that absent the option of incarcerating Arguelles without the possibility of parole, the court must take into account the possible future threat to society should he ever be freed. The court referred to the "reign of horror and terror engaged in by Mr. Arguelles in his three years of freedom" and expressed concern that if Arguelles were ever free again, more "horror and terror" would ensue.

¶ 108 The probability of future violence by a defendant is a legitimate aggravating factor to consider in sentencing. Utah Code Ann. § 76–3–207(2)(a)(iv). First, it applies only to a subclass of murderers. Not all murderers are considered a future threat to society if released. Additionally, being a threat if released is not unconstitutionally vague inasmuch as it serves to guide sentencers in their duty. Thus, it is not unconstitutional to consider potential for violence as an aggravating factor.

### B. Other Aggravating Factors

#### 1. Uncharged Crimes

 ¶ 109 The court assistant argues that because the trial court never obtained jurisdiction over two of the eight crimes listed as aggravating factors, these two crimes may not be relied on to support the sentence. The State counters that these crimes were only used to determine the sentence for the four convictions of aggravated murder and may be used to determine Arguelles's inclinations.

¶ 110 We held in *Lafferty* that uncharged crimes may be considered in the penalty phase of capital cases if the elements of the crimes are proven beyond a reasonable doubt. *State v. Lafferty*, 749 P.2d 1239, 1259 (Utah 1988). Section 76–3–207(2)(a)(ii) also states that evidence concerning "the defendant's character, background, [and] history" may be considered. Utah Code Ann. § 76–3–207(2)(a)(ii) (Supp.2001).

¶ 111 In accordance with *Lafferty*, the court stated during the sentencing hearing that each uncharged crime used as an aggravating factor was found to have occurred beyond a reasonable doubt. Additionally, the trial court stated that each uncharged crime was only relied upon "in minor part." Because the uncharged crimes were relied upon minimally, and were determined to have been committed beyond a reasonable doubt, we are unwilling to conclude that the uncharged crimes were erroneously considered during the sentencing phase.

#### 2. Victim Impact Evidence

¶ 112 The court assistant argues that victim impact evidence was used inappropriately as an aggravating factor. Victim impact evidence and its constitutionality are discussed in section VI, *infra*. Contrary to the court assistant's assertion, the record does not show that victim impact evidence was cited as an aggravating factor. In the sentencing proceeding, the trial court listed eleven aggravating factors and four mitigating factors. These factors were weighed in order to determine whether the death penalty was justified. After citing those factors the court acknowledged the sorrow of the families and expressed its "compassion and concern" for them, but this acknowledgment was not part of the court's review of aggravating factors, and we decline to read it as such. The trial court stated, "the court finds that the aggravating circumstances outweigh, if not eclipse, the mitigating," and made no mention of the victim impact evidence until later.

#### 3. Brutality

 ¶ 113 The court assistant challenges the trial court's use of brutality as an aggravating factor in the sentencing proceeding. He claims that brutality as an aggravating factor fails to narrow the classification of defendants who are death eligible. He also claims that there is "nothing in the evidence to justify the application of the heinousness aggravating factor to any of the murders." He further cites *State v. Tuttle*, 780 P.2d 1203 (Utah 1989), and Utah Code section 76–5–202(q) (Supp.2001) to establish that all murders are brutal and

proof of serious abuse prior to death must be present in order for heinous acts to qualify as aggravating factors. The State argues that regardless of whether the aggravating factor considered meets the technical definition of heinousness, the court is permitted to consider the nature of the criminal acts in determining the sentence.

¶ 114 We find the trial court did not err in considering the brutality of Arguelles's acts. First, regardless of whether the level of brutality rose to the level of heinousness as outlined in *Tuttle*, brutality may be considered if relevant to the balancing of aggravating and mitigating evidence. Utah Code Ann. § 76–3–207(2)(a)(iv) (Supp.2001). Second, the court assistant's suggestion that the evidence does not reveal any heinous aggravating factors is unsupported by the record. The trial court stated during the sentencing proceeding that "the defendant has shown an horrific brutality, particularly to Lisa Martinez." Contrary to the court assistant's assertion, this statement is not limited to Lisa Martinez and accurately describes the acts committed against the other victims as well. Even though the trial court did not specifically mention other victims, it references the heinous brutality committed against them, meeting the standard set forth in *Wood* and *Tuttle*. As in *Tuttle*, the murders here involved "terrible physical abuse before death that evidenced an intent to cause wholly unnecessary suffering to the victims." [25] *Tuttle*, 780 P.2d at 1218. The brutality of the crimes therefore met the threshold level of heinousness to warrant consideration as an aggravating factor.

4. Multiple Counting of Aggravating Factors

¶ 115 The court assistant argues that the trial court counted the same aggravating factors multiple times in determining Arguelles's sentence. The State argues that the trial court did not double count, and that even if it had, the court assistant has failed to

show that the double counting prejudiced Arguelles.

¶ 116 The trial court's discussion of aggravating and mitigating factors is somewhat unclear. On close analysis, the record indicates that some aggravating factors were referred to more than once and one factor was counted more than once by the trial court. For example, in discussing the number of victims killed, the court also makes reference to Arguelles's criminal history and the fact that Tuesday Roberts was killed to destroy her as a potential witness. The trial court later cites Arguelles's criminal record as an independent aggravating factor and the murder of a potential witness, i.e., Tuesday Roberts, as another independent aggravating factor.

¶ 117 While some aggravating factors appear to be referred to multiple times, only one aggravating factor appears to have been "counted" more than once. The trial court states that the fourth aggravating factor is that Arguelles's crimes "involved heinous acts of terror to the victims, including actual physical violence." The court then refers to the "horrific brutality" of the murders as the eighth aggravating factor. To be constitutionally sound, the aggravating factor of heinousness must narrow the class of death eligible defendants. Once the definition of heinousness is narrowed, the difference between brutality and heinousness is small. In fact, to meet the heinousness requirement listed in Utah Code section 76–5–202(1)(p), we have stated that a brutal act must constitute battery or torture. *State v. Wood*, 648 P.2d 71, 86 (Utah 1982). Thus, the trial court's treatment of heinousness and brutality as two separate aggravating factors was duplicative.

¶ 118 The court assistant cites *Parsons v. Barnes*, 871 P.2d 516 (Utah 1994), in support of his contention that aggravating factors may not be counted twice. In *Parsons* we held that a sentencer "cannot be allowed the opportunity to doubly weigh the commission of the underlying felony and the motive be-

---

**25.** For example, Tuesday Roberts was handcuffed to Martinez when Arguelles tried to sexually assault Martinez; Martinez struggled and was subsequently stabbed sixty-one times. Roberts watched her friend as she was stabbed repeatedly to death. Roberts was subsequently sexually assaulted and murdered.

hind [the] underlying felony as separate aggravators." *Id.* at 528 (quoting *Willie v. State,* 585 So.2d 660, 681 (Miss.1991)). Since robbery will presumably always be based upon the motive of pecuniary gain, we held that the defendant's motive in committing a robbery could not be considered as an independent aggravating factor. *Id.* The current case is not parallel to *Parsons* since the underlying crime here, aggravated murder, may be the result of various motives, only some of which might be considered as aggravating factors.

 ¶ 119 While we are sympathetic to the argument that it is generally inappropriate to count the same aggravating factor more than once in a sentencing proceeding, we note that the sentencing process does not involve a mere comparison of the number of aggravating factors to the number of mitigating factors. Rather, "[t]hese standards require that the sentencing body compare the totality of the mitigating against the totality of the aggravating factors, not in terms of the relative numbers of the aggravating and the mitigating factors, but in terms of their respective substantiality and persuasiveness." *Wood,* 648 P.2d at 83. Central to our inquiry then, is whether the trial court weighed the mitigating and aggravating factors correctly, as opposed to whether they were merely counted correctly.

¶ 120 The trial court did not err in its weighing of the aggravating and mitigating factors. Following Arguelles's guilty plea, the trial court convened a hearing to consider the aggravating and mitigating factors as outlined in Utah Code section 76–3–207(1)(a). The trial court then weighed the aggravating factors against the mitigating factors and determined that "the aggravating circumstances outweigh, *if not eclipse,* the mitigating. The evidence justifying the death penalty is overwhelming." (Emphasis added.) Setting aside the technical double "listing" of one aggravating factor, we hold that the trial

court correctly concluded that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. Therefore, any error stemming from the double reference was harmless.

## VI. VICTIM IMPACT EVIDENCE

 ¶ 121 The court assistant argues that the admission and use of victim impact evidence in the sentencing proceeding was unconstitutional. He argues that because each murder victim has "tremendous personal worth," using victim impact evidence does not distinguish non-capital crimes from capital ones.

¶ 122 The United States Supreme Court has held that under certain circumstances victim impact evidence is permissible under the federal constitution. *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Utah Code section 76–3–207 allows for the consideration of victim impact evidence during sentencing. Utah Code Ann. § 76–3–207(2)(a)(iii) (Supp.2001).

¶ 123 Even if we were to find victim impact evidence unconstitutional under state constitutional principles, in this case its admission would be harmless, and therefore, we do not treat the constitutional question.[26] First, as discussed *supra* in section V B 2, the record indicates that the trial court did not treat the victim impact evidence as an aggravating factor. Second, even if victim impact evidence were considered, very little was submitted, and it is unlikely this evidence had any effect on the sentencing outcome. Only four witnesses were called, who straightforwardly and rather briefly described the victims, their qualities, and the impact of their deaths on family and friends. In contrast, because of the violent nature of the crimes, the trial court found and relied on a tremendous amount of aggravating evidence. Even if the victim impact evidence admitted were deemed invalid, "subsequent invalidation of

---

**26.** The court assistant argues that the Utah Constitution requires the exclusion of victim impact evidence citing *State v. Carter,* 888 P.2d 629 (Utah 1995). Unfortunately, the court assistant merely restates arguments made in *State v. Honie,* 2002 UT 4, ¶ 61 n. 7, 57 P.3d 977, where we declined to consider if the Utah Constitution requires the exclusion of victim impact evidence because the briefs inadequately presented any arguments supporting this assertion. We would welcome an in-depth exploration of this issue in the future. At this time, however, we again decline to address the issue.

one of several statutory aggravating circumstances does not automatically require reversal of the death penalty." *Zant v. Stephens,* 462 U.S. 862, 890, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Given that the trial court did not formally consider victim impact evidence, and given that the victim impact evidence offered was minimal, we hold that any error attributed to the admission of such evidence was harmless.

## VII. RIGHT TO SPEEDY APPEAL

¶ 124 The court assistant argues that the government has violated Arguelles's right to a speedy appeal. The court assistant relies on *Harris v. Champion,* 15 F.3d 1538 (10th Cir.1994), to assert that such a right exists under federal law. The State argues that *Harris* is not binding on this court and that neither the United States Supreme Court nor this court has recognized a right to a speedy appeal.

¶ 125 We decline to recognize a right to a speedy appeal. There is no controlling federal precedent that recognizes such a right, and the court assistant has failed to demonstrate why this court should adopt this notion under the Utah constitution. As we have stated, "[a]s a general rule, we will not engage in state constitutional analysis unless an argument for different analyses under the state and federal constitutions is briefed.... This Court will not engage in constructing arguments out of whole cloth on behalf of defendants in capital cases." *State v. Lafferty,* 749 P.2d 1239, 1247 n. 5 (Utah 1988).

¶ 126 Even if we were to recognize a right to a speedy appeal, it would not have been violated in this case. The appeals process was interrupted for nineteen months when Arguelles attempted suicide and the case was remanded for a competency hearing. Further, the court assistant asked for numerous extensions from this court to complete and file his brief, both before and after the competency hearing. Thus, the court

assistant and Arguelles invited any delay of Arguelles's appeal.

## VIII. CONSTITUTIONALITY OF AGGRAVATED FELONY MURDER STATUTE AND DEATH PENALTY SCHEME

¶ 127 The court assistant claims that Utah's aggravated felony murder statute and death penalty scheme are unconstitutional. Specifically, the court assistant claims that each fails to narrow the class of death-eligible murders or to properly limit the discretion of the sentencer. We have addressed challenges to Utah's aggravated felony murder statute and death penalty scheme and found both to be constitutional. *See State v. Honie,* 2002 UT 4, ¶¶ 17–35, 57 P.3d 977; *State v. Lafferty,* 2001 UT 19, ¶ 141, 20 P.3d 342; *State v. Lovell,* 1999 UT 40, ¶ 38, 984 P.2d 382; *State v. Young,* 853 P.2d 327, 336–38 (Utah 1993); *State v. Holland,* 777 P.2d 1019, 1024 (Utah 1989). The court assistant has raised no new arguments concerning the statutes, and we therefore decline to address these claims again.[27]

## CONCLUSION

¶ 128 We find the court assistant's claims of error without merit. The trial court did not err in failing to move, sua sponte, for a competency hearing early in the proceedings or in finding Arguelles competent at the post-sentencing competency hearing. Arguelles knowingly, competently, and voluntarily waived his right to counsel, and his failure to offer additional mitigating evidence did not undermine the integrity of the verdict. Any error in disqualifying Arguelles's original counsel was harmless, as was the trial court's decision to allow press photography during the proceedings. The trial court did not improperly admit victim impact evidence. Arguelles's right to a speedy appeal has not been violated, and Utah's aggravated felony murder statute and death penalty scheme are not unconstitutional. We therefore affirm Arguelles's sentence.

27. The author of this opinion continues to hold the views expressed in her dissent in *State v. Young,* but acknowledges that those views have been rejected by the court, and therefore acquiesces in the operation of the court's precedent.

¶ 129 Justice RUSSON, Justice WILKINS and Judge GREENWOOD concur in Chief Justice DURHAM's opinion.

¶ 130 Having disqualified himself, Associate Chief Justice DURRANT does not participate herein; Judge PAMELA GREENWOOD from the Court of Appeals sat.

HOWE, Justice, concurring:

¶ 131 I concur. I express my appreciation and thanks to our court assistant appointed by this court to brief and argue the issues presented in this mandatory statutory appeal. I am mindful of countless hours of effort expended by him working through voluminous records and researching the difficult and sensitive issues in this capital case. All of this was done by him without monetary compensation.